**UNITED STATES ex rel. NORWEGIAN NITROGEN PRODUCTS CO., Inc., v. UNITED STATES TARIFF COMMISSION et al.**

(Court of Appeals of District of Columbia. Submitted January 5, 1925. Decided April 6, 1925.)

No. 4168.

1. **Customs duties ⬅⇒54—Tariff Commission cannot refuse to opposing interested parties, in proceeding for increased tariff, copy of petition, nor refuse to disclose evidence considered, except trade secrets.**

Under Tariff Act 1922, § 315, subd. (c), being Comp. St. Ann. Supp. 1923, § 5841c19, enlarging powers of the Tariff Commission granted by Act Sept. 8, 1916, §§ 706, 708 (Comp. St. §§ 5326g, 5326i) and requiring commission to give reasonable public notice of hearing on petition for increase of tariff on particular commodity and opportunity to interested parties to be heard, commission cannot refuse to give opposing interested parties a copy of petition before it in given case and opposition was entitled to facts privately presented to commission for its consideration, notwithstanding Act 1916, § 708, forbidding disclosure of trade secrets or processes.

2. **Customs duties ⬅⇒54 — "Trade secrets," within meaning of Tariff Act, defined.**

"Trade secrets," within meaning of Tariff Act 1916, § 708 (Comp. St. § 5326i), prohibiting Tariff Commission's disclosure thereof, ordinarily means an unpatented, secret, commercially valuable plan, appliance, formula, or process, which is used for the making, preparing, compounding, treating, or processing of articles or materials which are trade commodities.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Trade Secret.]

3. **Mandamus ⬅⇒81—Mandamus will not issue to compel Tariff Commission to proceed regularly, where President has already acted on commission's report.**

Mandamus will not issue to compel Tariff Commission to furnish opposing party, in proceeding for increased tariff on particular commodity, with copy of petition, or to disclose evidence considered, after President, pursuant to report of commission, has proclaimed an increased tariff, since writ, if granted, would not modify, affect, or vacate rate so fixed, nor compel restoration of former rate.

Appeal from Supreme Court of District of Columbia.

Suit by the United States, on the relation of the Norwegian Nitrogen Products Company, Inc., for writ of mandamus to be directed against the United States Tariff Commission and Thomas O. Marvin and others, constituting such Commission. From a judgment denying the writ, relator appeals. Affirmed.

Marion De Vries, of Washington, D. C., for appellant.

Peyton Gordon, and H. H. Glassie, both of Washington, D. C., W. S. Culbertson, of Bucharest, Rumania, and C. E. McNabb, of Washington, D. C., for appellees.

Before ROBB and VAN ORSDEL, Associate Justices, and SMITH, Judge of the United States Court of Customs Appeals.

SMITH, Acting Associate Justice. This is an appeal from a judgment of the Supreme Court of the District of Columbia, denying relators' petition praying for a writ of mandamus against the United States Tariff Commission.

Section 315(a) of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, § 5841c19) empowers the President to ascertain by investigation the differences in cost of production between articles, the growth and product of the United States, and like or similar articles, the growth and product of competing foreign countries. If that investigation develops that the duties fixed by the act do not equalize such differences, the President is authorized to determine and proclaim the

changes in classification or the increases or decreases in the rates of duty provided by the act necessary to equalize foreign and domestic costs of production.    Changes in classification and increased or decreased duties so proclaimed by the President take effect under the act within 30 days after the date of their announcement by the President.

Subdivision (c) of section 315 (Comp. St. Ann. Supp. 1923, § 5841c21) expressly provides that no proclamation shall be issued by the President changing the classification or increasing or decreasing duties until after an investigation of the differences in cost of production has been made by the United States Tariff Commission.  That subdivision makes it the duty of the commission to give public notice of its hearings and to afford to parties interested a reasonable opportunity to be present, *to produce evidence and to be heard*.  The rules, which the commission is authorized to adopt, prescribe that parties who enter an appearance in the investigations provided for by section 315 shall have the opportunity to examine *the report* of the commissioner or investigator in charge of the investigation and also *the record*, with the exception of such portions of the report or record as relate to trade secrets or processes which section 708 of the act of 1916 (Comp. St. § 5326i) forbids the commission to divulge.

On the 24th of October, 1922, the American Nitrogen Products Company, a corporation organized under the laws of the state of Washington, filed with the United States Tariff Commission a petition and brief, praying that the duty of three cents a pound imposed on sodium nitrite by the Tariff Act of 1922 be increased to 4½ cents per pound. On the 20th of July, 1923, notice was given by the commission that a public hearing would be held at its office at 10 o'clock a. m., on the 10th of September, 1923, concerning the subject-matter of the petition, and that at that time and place the parties interested would be given an opportunity to be present, to produce evidence, and to be heard as to differences in cost of production, and as to all other facts and conditions pertinent to the matters which were then to be the subject of investigation.

On the 10th of September, 1923, the Norwegian Nitrogen Products Company appeared before the commission and made a formal request that it be given a copy of the petition which initiated the investigation and which was filed by the American Nitrogen Products Company.   To that request the

American Nitrogen Products Company objected, on the ground that all information given to the commission as to its capital assets and costs of production was confidential, and was furnished on the promise that it would be so treated by the commission.  The chairman announced that "the commission has considered that, when any one submits information to it which is declared to be confidential, it shall observe the confidential relation."

On the 11th of September, 1923, the Norwegian Nitrogen Products Company in writing formally requested that it be supplied by the commission with all facts submitted to the commission, and also with a complete copy of the petition, in order that the company might be heard on the matters set forth therein.   In the written request was included a brief, in which it was stated that the Norwegian Nitrogen Products Company was entirely in the dark as to the real case and actual facts presented to the commission by the American Nitrogen Products Company, and that therefore the opposition to the petition was not in a position to meet the case or the facts so presented.   The brief also urged that, until the opposition had information as to all matters and every particle of evidence not trade secrets submitted to the commission, no valid finding by the commission could be had.  The commission ruled that it had obtained its cost data under pledges of confidence, and that it could not violate those pledges of its own motion.  The commission therefore declined to accede to the request of the opposition.

The commission furnished to the appellant the application of the American Nitrogen Products Company for an increase of duty, from which application, however, was deleted all data as to costs of production and all matter deemed to be confidential by the commission.  Appellant was also favored with a so-called summary of information, in which it was stated that the domestic price of soda ash, an important material in the manufacture of sodium nitrite, was on September 10, 1923, $1.45 per 100 pounds in bags at makers' works; that the normal consumption of sodium nitrite in the United States was about 6,000,000 pounds per year, and that domestic producers had plant capacities equal to about 87 per cent. of that requirement; that from 1,750,000 to 3,500,000 pounds of sodium nitrite were imported annually during the period 1914 to 1921, excepting the year 1920, in which year 11,690,000 pounds came into the country from abroad; that 50 per cent. of the demand for sodium nitrite in the

United States was supplied by imports; that, during the fourth quarter of 1922, 1,460,528 pounds of sodium nitrite were imported at an average declared value of 4 cents per pound; that, during the first 6 months of 1923, 3,647,125 pounds of nitrite were imported at an average declared value of 4.4 cents per pound; that the exports of sodium nitrite from Norway to the United States during March, April, and May, 1923, were 1,070,000 pounds; that the average invoice value was 4.84 cents per pound c. i. f. New York, from which was deducted packing, inland freight, ocean freight, and insurance, leaving an average price at the factory in Norway of 4.34 cents per pound.

An estimate of the cost of producing sodium nitrite in Norway was also supplied. With the exception of freight rates on soda ash and the domestic price thereof, no information whatever was apparently given to the appellant as to the domestic cost of producing sodium nitrites. After receiving the summary of information the opposition again demanded, first, a reasonable opportunity to inspect and to be heard upon all evidence which had been offered in the case, not deemed by the commission to be trade secrets, and not, in fact, trade secrets or processes; second, an inspection of all the evidence in the possession of the commission as to the cost of power used in the United States for the production of nitrite; third, information as to the evidence submitted to the commission concerning the number of laborers employed by the American Nitrogen Products Company and the wages which they received; fourth, inspection of the evidence submitted to the commission as to the capital invested by the American Nitrogen Products Company; fifth, an opportunity to cross-examine the experts of the commission as to the evidence submitted by them to the commission.

The commission ruled that it would permit the opposition to be heard and to introduce any evidence that it might have, but that it would not supply any information whatever in addition to that furnished by its summary of information. Inspection by the opposition of any original or primary data collected by the commission, and cross-examination of the commission's investigators as to any of the information secured by them, was also refused. The capital invested by the American Nitrogen Products Company, the value of its plant, the number of laborers employed by the company, the wages paid, and all details as to the cost of production of nitrites, was held by the commission to be confidential information, to which the opposition was not entitled.

While the investigation of the differences of costs of production of sodium nitrite in the United States and in competing countries was still pending before the United States Tariff Commission, and before its report as to the results of the investigation had been transmitted to the President, the relator on the 12th of September, 1923, filed in the Supreme Court of the District its petition for a writ of mandamus, which recited in substance the facts hereinbefore stated, and prayed, first, that a rule or order be granted directing the Tariff Commission and its members to appear and show cause why a writ of mandamus should not issue, requiring them to permit the relator to examine the petition of the American Nitrogen Products Company, and all data or information or evidentiary matter on file with the commission respecting the cost of producing sodium nitrite at the plant of said American Nitrogen Products Company, whether in the United States or out of it; second, that the Tariff Commission and its members show cause why a public hearing should not be allowed, at which the relator and any person or corporation appearing before the commission, having an interest in the subject-matter, should have the right and opportunity (a) to cross-examine the investigators, experts, agents, and witnesses who may have supplied data, information, or evidentiary matter to the commission; (b) to offer evidence in contravention of such data, information and evidentiary matter; (c) to present arguments and representations against said petition, and against the probative and legal value of any and all data, information, and evidentiary matter on file with the commission upon which the American Nitrogen Products Company based its application for an increase of duty on sodium nitrite.

The Supreme Court issued an order to show cause in accordance with the prayer of the petition, and in response to the order the Tariff Commission filed its answer, in which the demands made by the relator and the rulings thereon as hereinbefore set out were substantially admitted. To the answer a demurrer was filed, which was overruled by the court, and, the relator electing to stand upon its demurrer, the court on the 28th of April, 1924, ordered, adjudged, and decreed that the prayer of the petition be denied and the petition dismissed. From that judgment this appeal was taken.

After the denial of the petition for mandamus and the dismissal of the petition, the

Tariff Commission submitted to the President a report of its investigation of the cost of production of sodium nitrite in the United States, and the production cost thereof in Norway, the principal competing country. Subsequent to that report, and on May 6, 1924, the President issued a proclamation in which was recited the investigation made by the Tariff Commission and the President's finding that the costs of production in the United States and Norway, the principal competing country, were not equalized by the duties imposed by Congress on sodium nitrite. The proclamation also declared that it was necessary to increase the duty on sodium nitrite from 3 cents to 4½ cents per pound, in order to equalize costs of production, and accordingly advanced the duty on sodium nitrite from 3 cents to 4½ cents per pound.

[1] The Tariff Commission contended in the lower court, and contends here, that section 315(c) of the act of 1922, requiring the commission to give reasonable public notice of its hearings and a reasonable opportunity to interested parties to be present and produce evidence and to be heard, grants to the interested parties nothing more than the right to present to the commission such evidence as they may have and to argue their case. We cannot agree with that contention. Under the act of 1916 (39 Stat. 770) the Tariff Commission was a mere investigative body, charged with the duty of gathering tariff information and submitting the same whenever required to the President, the Committee on Ways and Means of the House, and the Committee on Finance of the Senate. Unquestionably under that act the Tariff Commission might hear or not hear interested parties, and whether it heard or refused to hear them no harm could come to any one, inasmuch as no change of duty could be accomplished without the intervention of Congress. Congress was not bound by anything that the commission might do, say, recommend, or find, and was entirely free to practice investigations on its own account, and to reach a conclusion as to the facts and the inferences to be drawn therefrom utterly at variance with that reported by the commission.

Section 315(c) of the Tariff Act of 1922, however, sought to make the dutiable list more flexible, by giving to the President in certain contingencies, and after investigations made by the Tariff Commission, the power to change the rates of duty fixed by Congress. Under that section the rates of duty prescribed by statute may be increased or decreased 50 per cent. by the President. That is a very large grant of power, if grant it be, and for its exercise nothing is required, except an investigation and report by the Tariff Commission.

For the correctness of his decision the President must rely on the commission's fairness, its knowledge of the facts as they are, and the verity of its findings and report. For the accuracy of its report and the wisdom of its recommendations, the commission in its turn depends on ex parte testimony taken by it and on the unverified reports of its investigations in the field, after such testimony and reports have been subjected to the test of the hearing which the statute and the commission's rules prescribe.

For the purposes of section 315(c) the commission is no longer left free to hear whom it pleases or what it pleases. It is required by law to give reasonable public notice of the hearing prescribed by the section, and to give reasonable opportunity to parties interested to be present, to produce evidence and to be heard. That notice, and the right of interested parties to be present, to produce evidence, and to be heard, was not designed, as the commission contends, to aid the commission in getting the economic facts. The commission needed no such help, inasmuch as the act of 1916 as originally passed furnished to that body adequate and effective means to secure all data, evidence, facts, information, and apparently even trade secrets and processes pertinent to its inquiries. See sections 706 and 708 of the Act of September 8, 1916 (39 Stat. 797, 798 [Comp. St. §§ 5326g, 5326i]).

The right of interested parties to be present, to produce evidence, and to be heard at the hearings contemplated by section 315(c) was granted by Congress, and not by the commission. That right was conceded to adverse interests, to protect them against the abuses of ex parte hearings and proceedings, and against ex parte statements and evidence which, if made known to those opposing a change in rate, might be discredited, controverted, or refuted.

The commission, in the exercise of the authority conferred upon it by the act of 1916, through its investigators gathered data as to capital investment, cost of power, wages paid to labor, and the cost of production of nitrites in the United States and abroad. Its refusal to disclose any of that information, with the exception of the price of soda ash, reduced to little better than an empty form the right of the opposition to be present, to produce its evidence, and to be heard.

Of what value to the opposition was the right to produce evidence, if the opposition knew nothing of the data collected by the commission, or of the facts or evidence submitted to the commission for its consideration in reaching a conclusion as to the cost of production of nitrites? Just how was the opposition to meet the petition of the American Nitrogen Products Company, if the former was not permitted to see the petition of the latter, and was supplied with nothing better than a deleted copy, from which was omitted every material allegation as to the costs of production set out in the petition actually filed with the commission? Of what use to the opposition was the right to introduce evidence on its part and to argue the case, if it had no knowledge of the data gathered by the commission, or of the information submitted by the American Nitrogen Products Company, or of the issues raised by the petition and the evidence?

To hold that the right to be heard means simply the right to produce evidence and to argue the case would leave interested parties at the mercy of those who initiated the proceeding, and render useless the safeguard which Congress manifestly interposed to protect importers, merchants, industrials, consumers, and even the commission itself from unreliable data, insufficient evidence, and mistaken conclusions of fact.

Barring trade secrets and processes, the disclosure of which is expressly forbidden, the opposition, by virtue of its statutory right to be heard, was entitled to be informed of the facts and evidence privately presented to the commission for its consideration. St. Louis Southwestern R. R. Co. v. I. C. C., 264 U. S. 64, 78, 44 S. Ct. 294, 68 L. Ed. 565. Indeed, under the rules of the commission itself, the Norwegian Nitrogen Products Company should have been given an opportunity to examine the record and the reports of the commission or investigator in charge of the investigation.

[2] The term "trade secrets," as ordinarily understood, means an unpatented, secret, commercially valuable plan, appliance, formula, or process, which is used for the making, preparing, compounding, treating, or processing of articles or materials which are trade commodities. In re Bolster, 59 Wash. 655, 110 P. 547, 29 L. R. A. (N. S.) 716; National Tube Co. v. Eastern Tube Co., 3 Ohio Cir. Ct. R. (N. S.) 459, 462, 464. There is nothing in the record showing, and the appellee does not claim, that the making known of any of the costs of production involved the disclosure of any unpatented,

secret, commercially valuable plan, appliance, formula, or process used for the making, preparing, compounding, treating, or processing of articles or materials. For the purposes of this case, therefore, the costs of production demanded by the opposition cannot be regarded as trade secrets.

Costs of production, of and by themselves, are simply matters of business privacy, the disclosure of which is not forbidden by section 708 of the act of 1916. Business privacy will be protected, it is true, from mere fishing expeditions in search of evidence (Federal Trade Commission v. American Tobacco Co., 264 U. S. 298, 305–306, 44 S. Ct. 336, 68 L. Ed. 696, 32 A. L. R. 786), and from the prying scrutiny of those who have no higher motive than curiosity, illicit gain, or malice. The disclosure of matters of business privacy may be compelled, however, if such matters be material and relevant evidence for the protection of the public, or for the determination of the rights of interested parties by a legally constituted tribunal or body authorized to procure and consider such evidence. Bank of Columbia v. Okely, 4 Wheat. 235–244, 4 L. Ed. 559; United States v. Louis. & Nash. R. R., 236 U. S. 318, 35 S. Ct. 363, 59 L. Ed. 598.

As the commission denied to the appellant access to facts, data, information, and reports which it had received for consideration as to the cost of producing nitrites in the United States on the sole ground that such facts, data, information, evidence, and reports were confidential, and as it does not appear from the record or the finding of the commission that the examination thereof involved the disclosure of any unpatented, secret, commercially valuable plan, appliance, formula, or process used for the making, preparing, compounding, treating, or processing of nitrates, we are of the opinion that the appellant was deprived of the right to be heard as contemplated by the statute.

[3] Notwithstanding the fact, however, that the appellant was not given the hearing prescribed by section 315(c), we are convinced that the granting of the writ prayed for would afford to the appellant no substantial relief. The purpose of the investigation made by the commission in this case was to furnish to the President information which would enable him to determine differences in costs of production, and to fix within the limits prescribed by statute a rate of duty which would equalize such differences. The commission has made its investigation and reported the results thereof to the President. The President has already acted on that re-

port, found the differences in costs of production, and made his decision as to the rate of duty which would equalize such differences.

Mandamus to the commission, requiring it to make the disclosures demanded, in order that the appellant might be properly heard, would not in any way modify, affect, or vacate the rate of duty fixed by the President, or compel him to fix a new rate, or to restore the rate prescribed by the act of 1922. Whether the investigation practiced by the commission was properly or improperly accomplished, its jurisdiction of the subject-matter ended when it made its report to the President and the President made his decision thereon. The Tariff Commission's relation to the President is substantially the same as that of a commissioner to a trial court. If the commissioner fails to accord a hearing according to law, the trial court may remand the matter to the commissioner for a proper hearing; but, after judgment on the report has been entered, errors committed by the commissioner during the hearing can hardly be corrected by mandamus proceedings. Certainly such errors could not be corrected in that way while the judgment was in full force and effect.

· The event which the appellant sought to avoid by appearing before the Tariff Commission has already happened without legal fault on the part of the respondent, and mandamus to the Tariff Commission to hear the appellant as prescribed by law would afford no relief, inasmuch as the writ could not affect the rate proclaimed. The sole purpose of the hearing by the Tariff Commission was to assist the President in determining whether or not he would change the statutory rate on the report of the commission. The President has not only decided to change, but has actually changed it. The commission has now no power to reopen the matter until the President against requires the assistance of the commission, as prescribed by section 315(c), and there is therefore no subject-matter upon which the writ could effectively operate. From that it follows that it would be useless to issue the writ, and that the writ should not be granted. People v. Clark, 70 N. Y. 518; Mills v. Green, 159 U. S. 651–653, 654–657, 16 S. Ct. 132, 40 L. Ed. 293; Brownlow v. Schwartz, 261 U. S. 216, 43 S. Ct. 263, 67 L. Ed. 620.

If the commission had made its report to the President in violation of a valid restraining order or writ of injunction, the appellant would not have been left without a remedy, and the court would be diligent in its endeavors to correct, as far as the law permitted, the wrong resulting from a contemptuous disregard of its orders. The cases cited by the appellant fully sustain that doctrine, but, as no restraining order of any kind was in force at the time the report of the commission was made to the President, the citations upon which the appellant relies are inapplicable to this case.

The judgment appealed from is affirmed, with costs.

Writ of error to Supreme Court of the United States allowed April 24, 1925.