CONSUMERS UNION OF UNITED STATES, INC., Plaintiff,

v.

VETERANS ADMINISTRATION; W. J. Driver, Administrator of Veterans Affairs of the Veterans Administration; Francis E. Blalock, Chief, Paperwork Management Division, Medical Administrative Service, Department of Medicine and Surgery, Veterans Administration; and H. M. Engle, M. D., Chief Medical Director, Department of Medicine and Surgery, Veterans Administration, Defendants.

No. 68–Civ. 2975.

United States District Court
S. D. New York.
July 10, 1969.

Karpatkin, Ohrenstein & Karpatkin, New York City, for plaintiff; by Marvin M. Karpatkin, Michael N. Pollet, Barry Satlow, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for defendants; by David L. Katsky, Simon P. Gourdine, Asst. U. S. Attys., of counsel.

CROAKE, District Judge.

## MEMORANDUM

Consumers Union of the United States, Inc., brings this action to compel the Veterans Administration (VA) and several of its officials to make specified records of the VA's hearing-aid testing program available to it. Under our reading of the Freedom of Information Act, 5 U.S.C. § 552, Congress has not exempted these records from its broad mandate that public records be available to the public. Since, however, the equity jurisdiction of this court has been invoked, we have weighed the benefits and dangers of disclosure and will compel the VA to make only the records of "raw scores" for the 1968 contract year available.

Consumers Union is a non-profit corporation which purchases consumer products in the open market, tests them, and reports its findings and evaluations in Consumer Reports, a monthly magazine with a circulation of about 1½ million.

The VA hearing-aid testing program was initiated in 1955 as a means of evaluating hearing aids for procurement and distribution to veterans. The program has remained about the same since its inception. Invitations to bid are sent to hearing aid manufacturers some six months before the start of a "contract year," a period starting on August 1 preceding the calendar year. Companies which submit bids must provide the VA with samples. The samples are tested by methods described in the invitation to determine their acoustical and electronic characteristics. The VA converts the raw scores from the tests into a single "quality point score" for each model sub-

mitted; the "scoring scheme"—mathematical formulae utilizing statistics—is used to compute the quality point scores.[1] Using the quality point scores, the prices, and research needs, the VA selects the models it wants to purchase and negotiates contracts for them.

The policy of the VA, as stated in the invitations to bid, has been to limit access to information about the testing program. The key provision in the invitations for the 1968 contract year stated:

> "The results of these tests and the evaluations based thereon are primarily for VA use only, without regard to any other governmental or private agency. It must be realized, however, that the Administration of Veterans Affairs may be required to release hearing aid test data, identified by the manufacturers' names to other agencies within the Federal Government structure. If this should occur, the Veterans Administration would no longer retain control over release of the test data to the public." [2]

In accordance with this policy, the scoring scheme and quality point scores have not been disclosed to anyone. Under another provision of the invitations, the raw scores have been furnished to each manufacturer for his own models, but to no one else.[3] The testing methods used by the National Bureau of Standards are included in the invitation and were made available to the plaintiff.

In September of 1967 Consumers Union requested the raw scores, scoring schemes and quality point scores for the prior two contract years; their request was later changed to cover contract year 1968 only. After exhausting the administrative procedures required by VA regulations [4] and not receiving the records, this action was commenced.

Consumer Union's request for VA records came in the wake of the passage of the Freedom of Information Act. The key portion of that Act, now codified, is as follows:

> * * * each agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. * * * [5]

The purpose of the Act, seen in the statutory language and the legislative history, was to reverse the self-protective attitude of the agencies under which they had found that the public interest required, for example, that the names of unsuccessful contract bidders be kept from the public.[6] The Act made disclosure the general rule and permitted

---

1. "The first determination made is into which of three power categories the power hearing aids fall. Once that is made, then the hearing aids within those three categories are analyzed in the same fashion. There are a number of factors at which the Veterans Administration looks. They take raw scores, list the raw scores, determine the mean and standard deviation of raw scores, * * * For each of the factors this conversion to a common scale is made. We select an arbitrary mean and an arbitrary standard of deviation, convert all scores to this. Then weights are applied to the distribution. Then the three scores of the instruments of each model are averaged, so that we come up for each of the factors, one number that represents that instrument's or model's performance or factor. Toward the end of the analysis, the numbers representing the quality on each of the fac-

tors is summed, and we come up with a final performance score." Tr. pp. 174–176.

2. Invitation, Bid and Award for contract year 1968, Defendants' Ex.D. ¶ J(1), at 17.

3. *Id.* ¶ J(4).

4. 38 C.F.R. §§ 1.553–1.558 (1968).

5. 5 U.S.C. § 552(a) (3).

6. The common agency practice of secreting public information is described in the legislative history. S.Rep. No. 813, 89th Cong., 1st Sess. 3 [hereafter Senate Report] (1965); H.R.Rep. No. 1497, 89th Cong., 2d Sess. [hereafter House Report] 5–6, 1966 U.S.Code Cong. & Admin.News, vol. 2, p. 2418 (1966). The authority for withholding information was the former § 1002 of Title 5, Administrative Procedure Act, § 3, 60 Stat. 238.

only information specifically exempted to be withheld;[7] it required the agency to carry the burden of sustaining its decision to withold information in a de novo equity proceeding in a district court.[8] Disclosure is thus the guiding star for this court in construing the Act. Because portions of the Act are patently ambiguous, its illumination will be most useful.

The VA has not seriously contested that the raw scores, scoring scheme, and quality point scores for contract year 1968 are not "identifiable records." The statutory question therefore is whether they are exempted. Although several cases that construe exemptions have been reported, no similar case to this one has been decided. We will discuss each exemption in turn at length, hoping to resolve some of the problems of interpretation.[9]

### STATUTORY EXEMPTIONS

*Exemption (2)*

This section does not apply to matters that are * * * (2) related solely to the internal personnel rules and practices of an agency.

The difficulty posed by this exemption could have been eliminated in drafting the Act, for it is a very simple one. Do the adjectives "internal" and "personnel" modify the noun "practices" as well as the noun "rules"? From a grammatical point of view, it is probable that the Congress intended both nouns to be modified by the adjectives for otherwise "the" would have been inserted before "practices." Since an article is a slim thread upon which to hang an interpretation, we look to the legislative history for clarification.

Senate Bill 1160 [10] passed in the Senate on October 13, 1965. It was accom-

panied by the report of the Judiciary Committee which explained exemption (2) in this way.

Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of those may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like.[11]

The Senate apparently intended to exempt only internal personnel rules and internal personnel practices. In the House, S. 1160 was studied and reported on by the Government Operations Committee before passage in June of 1966. Attempting to clarify the second exemption, the House Committee wrote the following:

Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.[12]

This court is thus confronted with a situation where the Congress was of two minds in passing legislation and where the second house to act chose to express its intent in a committee report rather than in the statute whose language had already been defined by the other house.

The Assistant United States Attorney representing the Veterans Administration cites a memorandum by the Attorney General [13] which this court has care-

7. 5 U.S.C. § 552.

8. 5 U.S.C. § 552(a) (3).

9. The most extensive article on the Act, K. Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761 (1967), is a useful guide to these problems and possible resolutions.

10. 89th Cong., 1st Sess.

11. Senate Report 8.

12. House Report 7–8.

13. U. S. Dept. of Justice, Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act [hereafter Attorney General's Memorandum] (1967).

fully studied. The Attorney General's conclusions do not have the weight of a contemporaneous administrative interpretation since he is not charged with administering the Act.[14] He recognized moreover that definitive resolution of some ambiguities—perhaps those presented here—would have to await court rulings.[15] The analysis of exemption (2) by the Attorney General fails to discuss the Senate Report.

■ To construe exemption (2), this court follows the only reported decision discussing it and accepts the Senate reading of the statute since its report was before both houses of the Congress.[16] This interpretation is more consistent with the purpose of the Act and it avoids a possible internal contradiction. The House interpretation exempts "practices" of the agency while subsection (a) (1) (C) requires that "rules of procedure" be published in the Federal Register and subsection (a) (2) (C) mandates that "administrative staff manuals and instructions to staff that affect a member of the public" be made available for public inspection and copying. Unless "rules of procedure" and "staff manuals" are not "practices," the Senate interpretation must be accepted.

Since the records sought in this action are not related to personnel matters, exemption (2) is inapplicable.

14. Udall v. Tallman, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

15. Attorney General's Memorandum, p. IV.

16. Benson v. General Services Administration, 289 F.Supp. 590, 595 (W.D.Wash. 1968).

17. The entire section reads: "Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent *not authorized by law* any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations,

*Exemption (3)*

This section does not apply to matters which are * * * (3) specifically exempted from disclosure by statute.

The government has argued that the records Consumers Union seeks are specifically exempted from disclosure by 18 U.S.C. § 1905 and 38 U.S.C. § 216(a) (2).

■ Section 1905 of Title 18 prohibits disclosure of information coming to a government official or employee in the course of his duties if that information

> concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the indentity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association;[17]

The only case we found defining "trade secrets" was decided under a predecessor statute.

> * * * an unpatented, secret, commercially valuable plan, appliance, formula, or process, which is used for the making, preparing, compounding, treating, or processing of articles or materials which are trade commodities. * * * [18]

The records sought here contained data available to any persons with the resources and facilities to perform the

style of work, or appartus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person *except as provided by law*; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment." (Emphasis added.)

18. United States ex rel. Norwegian Nitrogen Products Co. v. United States Tariff Comm., 55 App.D.C. 366, 6 F.2d 491, 495 (1925), rev'd on other grounds, 274 U.S. 106, 47 S.Ct. 499, 71 L.Ed. 949 (1927).

tests; they do not appear to contain trade secrets or other information mentioned in § 1905.

The only case brought to the attention of this court in which the government relied on § 1905 was Grumman Aircraft Engineering Corp. v. The Renegotiation Board in which no opinion was filed.[19] Since two other exemptions were also argued by the government, we have no way of knowing which exemption the court relied on in refusing to order disclosure.

We conclude that the records sought by Consumers Union are not within the scope of 18 U.S.C. § 1905.[20]

■ The second statute relied on by the government to exempt the hearing aid testing records encourages disclosure rather than specifically prohibiting it. Section 216(a) of title 38 reads as follows:

(1) The Administrator shall conduct research in the field of prosthesis, prosthetic appliances, orthopedic appliances, and sensory devices.

(2) In order that the unique investigative materials and research data in the possession of the Government may result in improved prosthetic appliances for all disabled persons, the Administrator may make available to any person the results of his research.

Subsection 2 in fact contains the gist of Consumers Union's argument and might even have been used to buttress it.

We accordingly conclude that the records sought are not specifically exempted from disclosure by any statute cited by the government.

*Exemption 4*

This section does not apply to matters that are * * * (4) trade secrets and commercial and/or financial information obtained from a person and privileged or confidential.

The plain language of this section exempts only (1) trade secrets and (2) information which is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential. The exemption given by the Congress does not apply to information which does not satisfy the three requirements stated in the statute.

The words "commercial or financial" were added to the 1964 bill [21] which was reintroduced in 1965 as S. 1160. The congressional reports on S. 1160 simply adopted the Senate report on the 1964 bill [22] without altering the commentary to reflect the addition of "commercial or financial." Although the congressional reports on S. 1160 say that information not commercial or financial in nature is exempted,[23] this court is required to follow the words of the Congress.[24]

■ The words "obtained from a person" were changed from "obtained from the public" by the Senate Judiciary Committee.[25] The suggestion that this change was intended to exempt information obtained from another person within

---

19. Civ. No. 1595–68 (D.D.C. Nov. 14, 1968).

20. Because of this conclusion it is not necessary to straighten out the difficulty caused by having one statute which directs disclosure of records unless they are otherwise exempted and another statute which prohibits disclosure unless otherwise authorized.

21. S. 1666, 88th Cong., 2d Sess. (1964).

22. S.Rep. No. 1219, 88th Cong., 2d Sess. (1964).

23. Senate Report 9; House Report 10.

24. But see Barceloneta Shoe Corp. v. Compton, 271 F.Supp. 591 (D.P.R.

1967); The Tobacco Institute v. FTC, Civ. No. 3035–67 (D.D.C. Aug. 8, 1968) (no opinion). In *Barceloneta*, the results of an NLRB investigation were held to be exempt; the records sought may not have been commercial or financial in a strict sense. The FTC's summary judgment motion papers in *The Tobacco Institute* case cite exemptions 4 and 6; nevertheless the court, in deciding for the FTC, probably rested its decision on the promised confidentiality for responses by individual professionals about the effect of health warnings on cigarette packages.

25. Senate Report 1–2.

the government was first made in the Attorney General's memorandum.[26] This interpretation entirely disregards the reason given by the Committee for the change.

> It was pointed out in statements to the Committee that agencies may obtain information of a highly personal and individual nature. To better convey this idea the substitute language is provided.[27]

The Committee clearly had no intention of including information obtained from other government sources in the exemption. To include it would pervert the purpose of the Act for then commercial and financial information could be made secret simply by transferring records from one agency to another with a promise of confidentiality. We accordingly follow the only reported decision on this point and hold that the information must be obtained from outside the government to be exempt.[28]

Do the records sought here satisfy the three requirements for exempt information other than trade secrets? Although the information might be deemed "commercial" it was not "obtained from any person" or "confidential." The VA has not argued that the records are "privileged."

The information sought was generated within the government. The only things that the VA obtained from outside the government were the hearing aids themselves. Using government personnel and expertise and equipment, the VA produced the data now sought. To say that the information was obtained from outside the government because the hearing aids were given to it for testing is to ignore the substantial public expense needed to support the program. Had the VA bought the samples rather than receiving them without charge, there would be no doubt that the records now sought should be disclosed; the source of the samples should not govern the public's right to know about a government testing program.

From the inception of the hearing aid program, the VA has had a policy of keeping the information produced at public expense secret. The invitations to bid for contract years 1959 through 1967 contained the language:

> "The results of these tests and the evaluations based thereon are primarily for VA use only, without regard to any other governmental or private agency." [29]

In the 1968 contract another sentence was added:

> " * * * It must be realized, however, that the Administration of Veterans Affairs may be required to release hearing aid test data, identified by the manufacturers' names to other agencies within the Federal Government structure. If this should occur, the Veterans Administration would no longer retain control over release of the test data to the public." [30]

Thus, despite the policy of confidentiality, there was no guarantee that the 1968 information would be kept confidential. At best VA promised to do what it could to protect the information. In all probability the change in the 1968 invitation reflected the passage of the Freedom of Information Act.[31] The Act thus had the desired effect of making government information available to the public. For this court to now hold that the language in the 1968 invitation constituted a promise of confidentiality would be to reverse

---

26. Attorney General's Memorandum 34.

27. Senate Report 2. As noted in the previous paragraph, the Committee reports inexplicably fail to reflect the inclusion of the words "commercial or financial." This failure does not, however, affect the weight of this quotation with respect to the word "person."

28. Benson, *supra*, n. 16 at 594 of 289 F. Supp.

29. Invitation, Bid and Award for Contract Year 1967 Defendants' Exhibit E at 17.

30. Defendants' Exhibit D at 17.

31. The Act was signed on July 4, 1966 and became effective one year later. The 1968 contract year began Aug. 1, 1967.

the effect of passage of the Act and to defeat its purpose.

█ This court accordingly concludes that the records sought do not come within exemption (4).

*Exemption 5*

This section does not apply to matters that are * * * (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.

The law which sets the limits of discovery of documents in civil actions with government agencies once a good cause is shown is Rule 26(b) of the Federal Rules of Civil Procedure.[32] The scope of discovery is quite broad,

"Unless otherwise ordered by the court as provided by Rule 30(b) or (d), the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the examining party or to the claim or defense of any other party, * * *. It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence."

The discoverability of documents is limited under Rule 26 by the nature of the action. Since the Freedom of Information Act exempts only records "not available to a party other than an agency," it does not limit the actions used to test the exemption to ones in which the person seeking the documents is or might be involved. To determine if the requirements of the fifth exemption are met, this court must ask if the records sought are inter- or intra-agency memoranda or letters which would not be available to any party in any litigation in which the agency having the records might now be involved.[33] The fulcrum of this test is discovery practices as regulated by the courts, not discovery as it is practiced by the government, as suggested by the Attorney General's Memorandum.[34]

It is not difficult to hypothesize actions in which the hearing aid testing records would be relevant. The most obvious action would be one for breach of a hearing-aid supply contract. Good cause for discovery is equally easy to imagine. The question that deserves some consideration is whether the records would be privileged and thus outside the scope of Rule 26(b). There are several privileges which protect government records. The records may partake of the "executive privilege" and contain facts which the national security requires be non-public; [35] these records could be protected under the first exemption by an executive order. The privilege, which the government may exercise, of an individual to have personal data about him held in confidence, protects other documents and is specifically recognized by the sixth exemption of the Federal Information Act. Government records may be conditionally privileged because they are part of the deliberative process that must precede any well-taken decision or policy statement. It is material protected by this third privilege that the fifth exemption was apparently intended to cover [36] so its outlines must be sketched.[37]

32. Fed.R.Civ., P. 34.

33. Stating the test for the exemption in this way is not contrary to the burdens of proof as described in *Benson, supra* n. 16, at 595.

34. At 35.

35. United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The importance of "executive privilege" as an absolute privilege is lessened by the announcements of Presidents Kennedy and Johnson that it would be invoked by no one but the President himself. House Report 2.

36. Senate Report 9; House Report 10; Attorney General's Memorandum 35–37.

37. There are, of course, other privileges more limited in scope, which are inapplicable here. The contention that all expert opinions obtained by the government are privileged is untenable.

Boeing Airplane Co. v. Coggeshall [38] involved records similar to those sought here. *Boeing* was involved in a proceeding in the Tax Court to determine the amount of excess profits it owed the United States. A Tax Court subpoena was issued to the United States Renegotiation Board for its files related to the contract. The Court of Appeals, reviewing a district court refusal to enforce the subpoena, observed that

" * * * To the extent that the documents deal with recommendations as to policies which should be pursued by the Board, or recommendations as to decisions which should be reached by it, the claim of privilege is well founded. * * * " [39]

It nevertheless reversed the lower court.

But the files of the Board may well contain investigatory or other factual reports by Board employees, or reports and recommendations from persons outside the Board, which are relevant to a determination of excess profits. Investigatory or factual reports not containing state or military secrets * * * have not ordinarily, without more, supported claims of privilege. * * * [40]

The distinction between documents which are part of the administrative reasoning process and factual or investigatory reports is found in other cases as well,[41] and is supported by dictum in another case involving this exemption.[42] The distinction was also used to determine the scope of the seventh exemption which also turns on the availability of the records in a civil action with the government.[43]

To decide whether the records sought here are within the fifth exemption, this court must determine whether they were part of the deliberate process of the agency or were factual in substance. The legislative history of the Act supports this conclusion. The language "which would not be available by law to a party other than an agency in litigation with the agency" was substituted on the recommendation of the Senate Judiciary Committee for "dealing solely with matters of law or policy." [44] In explaining the old language the Committee had said in an earlier report that "All *factual* [sic] material in Government records is to be made available to the public * * *." [45] The substituted language, being more precise, seems to be a refinement of the policy versus fact distinction so that the distinction can still be used within the discovery test now explicitly laid down by the statute. It is at least clear, in light of the strong Congressional drive to promote disclosure, that the amendment was not intended to place "factual material" within the coverage of the fifth exemption.

■ The raw scores, which are simply objective measures of the samples' performances, are clearly not within the

---

38. 108 U.S.App.D.C. 106, 280 F.2d 654 (1960).

39. *Id.* 280 F.2d at 660.

40. *Id.* at 660–661.

41. Machin v. Zuckert, 114 U.S.App.D.C. 335, 316 F.2d 336, cert. den. 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); Zacher v. United States, 227 F.2d 219 (8th Cir. 1955), cert. den. 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858 (1956). United States v. Procter & Gamble Co., 25 F.R.D. 485 (D.N.J.1960); Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958).

42. American Mail Line, Ltd. v. Gulick, 411 F.2d 696 (D.C.Cir. Feb. 17, 1969). The court held that an agency memorandum which formed the basis of a decision was no longer "intra-agency."

43. Cooney v. Sun Shipbuilding & Drydock Co., 288 F.Supp. 708, 712–716 (E.D.Pa. 1968).

44. Senate Report 1–2.

45. S.Rep. 1219, 88th Cong., 2d Sess. 7 (1964). See also *Id.* at 14. The author of the 1965 report adopted most of the 1964 report verbatim. He deleted all sentences containing references to "legal and policy matters" and in the process deleted the clause quoted here. The remainder of the quoted sentence read " * * * as well as *final* [sic] determinations on legal and policy matters which affect the public."

fifth exemption. The scoring scheme, while it is used in procurement decisions, is a mathematical formula, not a recommendation.[46] To disclose it would not hinder the flow of advice in any decision-making process.[47] The quality point scores, being the mathematical result of plugging the raw scores into the scoring scheme,[48] cannot be privileged if the elements composing them are not.

We accordingly find that the raw scores, the scoring scheme, and the quality index scores would "be available by law to a party other than an agency in litigation with the agency," and are not exempted from disclosure by the fifth exemption.

*Balancing the equities*

■ Even though the records sought are not exempt, the court is not bound under the Act to automatically order their disclosure. In exercising the equity jurisdiction conferred by the Act,[49] it must, according to traditional equity principles, weigh the effects of disclosure and non-disclosure and determine the best course to follow at the present time.[50] In an action under the Freedom of Information Act, which shifts the burden of proof to the defendant,[51] the balance of the equities is presumptively on the side of disclosure. The rule that will be followed, therefore, is this: where agency records are not exempted from disclosure by the Freedom of Information Act, a court must order their disclosure unless the agency proves that disclosure will result in significantly greater harm than good. Be-

cause the Act was intended to benefit the public generally, it is primarily the effects on the public rather than on the person seeking the records that must be weighed.

■ Underlying the VA's case seems to be the proposition that the records should be kept confidential because manufacturers have been told that this is the VA policy. In some other situations disclosure might indeed be unfair and the court might weigh the effect of such a policy in balancing the equities although it violated the Act. Here, however, the manufacturers were advised in the invitation that the VA could no longer guarantee confidentiality.[52] It would not be unfair to the manufacturers to release the 1968 information to the public now.

■ A second proposition put forth by the VA to generally support its position is that the information sought is valuable[53] and that, as stated in the Attorney General's Memorandum, "there is no indication anywhere in the consideration of this legislation that the Congress intended * * * to give away such property to every citizen or alien who is willing to pay the price of making a copy."[54] This contention flies in the face of the general disclosure provision of the Act and suggests, as the VA did explicitly, that the government owes no more duty to its citizens than does a private non-profit corporation.[55]

The VA argues that the harmful effects of disclosure are threefold: 1) the information may mislead the public in their selection of hearing aids, 2) the

46. See n. 1, *supra.*

47. This is the rationale given for the exemption. House Report 10. Attorney General's Memorandum 35.

48. See n. 1, *supra.*

49. 5 U.S.C. § 552(a) (3).

50. Hecht Co. v. Bowles, 321 U.S. 321, 328, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

51. 5 USC § 552(a) (3).

52. See p. 803 *supra.*

53. The VA credited nearly $60,000 to the account of the National Bureau of Stand-

ards for testing the 1968 samples, tr. 104–05; and $7,900 to the consultants for attending a meeting related to the 1968 contract, Defendants' Exhibit C.

54. At 34.

55. The VA relied on Application of Consumers Union of the United States, 27 F.R.D. 251 (S.D.N.Y.1961). The contention may have merit with respect to formulae, designs, and drawings which the Attorney General's Memorandum was referring to; where ideas are inscribed on paper the papers may not be "records."

VA procurement and research programs will be disrupted so that the quality of its services to hard-of-hearing veterans will suffer, and 3) manufacturers who do not choose to participate in the program will be injured. These alleged harms will be discussed with respect to the raw scores, the quality point scores, and the scoring scheme.

We find that there will be no significant harm to the public from release of the raw scores. For the most part the scores—measuring such factors as harmonic distortion and signal-to-noise ratio in scientific units—will be unintelligible to the layman.[56] Any possible misinterpretation of the data by professionals can be avoided, according to testimony of a VA official, by releasing explanatory material with the scores.[57] With such explanations, the harm to non-participating manufacturers will be minimal. Since the 1969 invitation permitted the VA to release the raw scores in its discretion [58] and the VA has announced its intention to release the 1970 raw scores,[59] we find that its procurement and research programs will not be significantly disrupted.[60] Finally, if releasing the raw scores does cause anyone injury, it would more than be outweighed by the benefits, recognized by the VA officials who testified, of providing professionals with data on a significant number of hearing aids on the market.[61]

The possibility of the public being misled is greater with the quality point scores since the models are ranked against each other for all-over performance.[62] A person could easily think that a top-rated model would be best for him, failing to recognize that different hearing deficiencies require different types of hearing aids, and that the hearing problems of veterans are different from those of the general population.[63] It is easy to visualize a salesman misrepresenting the quality point scores as VA recommendations. Although there are competent hearing-aid consultants available, the danger exists that persons who do not seek their advice will be misled by the quality point scores. This danger could be lessened, but not eliminated, by a proper explanation of the scores. The danger, although difficult of quantification, is nonetheless a significant one because of the injury, discomfort, or financial loss that hard-of-hearing persons would suffer. There are no demonstrated benefits counterbalancing this danger.

The VA feels that releasing the quality index scores would cause the manufacturers to submit fewer models for testing. Fewer models would therefore be available for selection and research and the veteran population would suffer. There is no concrete evidence that this would occur. Although the VA has had expressions of support for its policy of confidentiality from manufacturers, none have said or written that they would submit fewer models if the policy were changed.[64] The policy seems to exist because the VA officials do not know what will happen.[65] With this record before it, the court must decide that disclosure of the quality point scores would not result in disruption of the VA procurement and research programs.

Assuming that fewer models were submitted, the testing program could be continued if the VA purchased samples rather than receiving them free.[66] It has been stipulated that the cost of purchasing the number of samples now tested would be in a modest-to-high five

56. Tr. 176, 199.

57. Tr. 226–28.

58. Tr. 161–62.

59. Tr. 167–68.

60. Some manufacturers may submit fewer new models (Tr. 208, 232–36), but this has not been shown to have a serious impact on the programs.

61. Tr. 224–26, 228.

62. See n. 1 *supra.*

63. Tr. 148–49, 201–203.

64. Tr. 139, 142–43, 145, 210, 215, 217.

65. Tr. 144–45, 155, 218.

66. Tr. 238–39.

figure number.[67] If there were a significant benefit to be gained from releasing the quality point scores, this cost would not be substantial enough to prevent it.

Finally, with respect to the quality point scores, the VA argues that non-participating manufacturers will be injured because the public will prefer to buy models that are rated or will surmise that unrated models were not submitted because they were inferior.[68] If the VA were to prohibit those who submit bids from using the results for advertising, the danger would be minimal.

It is argued that release of the scoring scheme would result in manufacturers designing and submitting hearing aids that would score well in the VA tests. The VA would receive only "government-type" hearing aids, limiting its selection and curtailing its research program.[69] After government-type aids had been developed by several manufacturers, they would attempt to refine them, but VA would still not get the variability it wants.[70] Releasing the scoring scheme would help other laboratories, such as Consumers Union's, devise scoring schemes for their own testing programs, but we find that this benefit is outweighed by the disruption of the VA programs.

■ We accordingly find that the benefits of releasing the raw scores outweigh any harm, but that the danger of the public being misled by releasing the quality point scores and the disruption of the VA programs that releasing the scoring scheme would cause outweighs any benefits. We conclude that the VA should be ordered to release only the raw scores for contract year 1968.

*Individual Defendants*

Consumers Union seeks injunctive relief against three VA officials as well as the agency itself. The complaint names the Administrator and two officials responsible for ruling on requests for records made under the Act. The responsibilities of those officials are admitted in the answer.

A motion has been made to dismiss the action against the VA officials as an unconsented suit against the government. Reliance is placed on cases dismissing actions in which the only officer whom Congress said may be sued was not made a defendant. Here, however, the Act permits the agency to be sued and it was; the question is whether officials of an agency against which suit has been consented to may also be named as defendants.

■ An injunction issued against an agency binds its responsible officials who have notice; otherwise, issuing the injunction would be an empty gesture.[71] Since the officials named here will be bound by the injunction if they have notice of it, we conclude that this action against them is not an unconsented suit against the government.

In other cases making officials defendants could introduce the extraneous issue of their responsibility.[72] The procedure of naming the agency only as outlined in the Attorney General's Memorandum [73] is therefore more desirable than the one followed here and this decision is not contrary to it.

Accordingly, an injunction shall issue enjoining the defendants from withholding records of the raw scores of hearing aids tested for contract year 1968 and ordering production of these records to

---

67. Tr. 134.

68. Tr. 209.

69. Tr. 206, 245.

70. Tr. 251.

71. An officer of a corporation may be held in contempt for failure to comply with an order naming only the corporation. Par-

ker v. United States, 126 F.2d 370, 374 (1st Cir. 1942) ; United States v. Garden Homes, Inc., 144 F.Supp. 644, 645 (D.N. H.1956).

72. See United States ex rel. Touhy v. Ragen, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951).

73. At 28–29.

the plaintiff. This memorandum decision shall constitute a findings of fact and conclusions of law of the court in accordance with Rule 52.

So ordered.