Henry BENSON, Plaintiff,

v.

**GENERAL SERVICES ADMINISTRA-
TION, Defendant.**

No. 7344.

United States District Court
W. D. Washington, N. D.

Jan. 4, 1968.

Bogle, Gates, Dobrin, Wakefield & Long, Don Paul Badgley, Seattle, Wash., for plaintiff.

Eugene G. Cushing, U. S. Atty., Seattle, Wash., Albert E. Stephan, Asst. U. S. Atty., for defendant.

LINDBERG, Chief Judge.

This action has been filed under the Information Act 5 U.S.C. Section 552 effective July 4, 1967 to enjoin the General Services Administration from withholding certain agency records and to order the production of those records as improperly withheld from the plaintiff. The records involved are defendant's exhibits A through L, which were received by the court in camera. A brief general description of the contents of these exhibits follows:

A.  Disposal Plan dated February 19, 1962, removed from the Disposal Plan Folder. The Disposal Plan is a five page memorandum prepared solely for internal use pursuant to GSA procedures regarding the disposal of surplus real property. It was prepared by a GSA realty officer as a recommendation to the regional office Chief, Real Property Division, Utilization and Disposal Service (UDS), which is now the Property Management and Disposal Service (PMDS). In this case, approval of the GSA Central Office also was required. The Disposal Plan details the most efficient division of the property for disposal, based on consideration of the potential use and fair market values (which are discussed) of the various portions of the Auburn General Depot. In addition to recommending the outright sale of some parcels, it recommended transfer of a portion to GSA for its own use and interim out-leasing of another portion. Once the plan was approved, it was to be followed by the regional office in making the disposal.

B.  Memorandum dated June 15, 1962, removed from the Sealed Bid Sale Folder. This memorandum was prepared by Realty Officer R. A. Stuart as a recommendation to the Chief, Real Property Division, UDS, regarding the disposition of bids received in response to GSA's invitation for bids for Sale No. 1OUR–32. The memorandum evaluated the high bids for each parcel as compared with fair market value and recommended a course of action on the bid of Diamond Ice and Storage Company on Parcel 1, the amended bid of the group later to become Auburn Industrial Center on Parcel 2, and the alternate lease-purchase bid of a similar group on Parcel 3. This memorandum was used as a guide for higher authority and as a record of the reasons for the action taken.

C.  TWX dated June 18, 1962, from Regional Administrator to Commissioner, UDS, requesting authority to deviate from standard credit terms if the alternate bid for lease and purchase of Parcel 3 were accepted, removed from Sealed Bid Sale Folder. Any award on the alternate lease-purchase bid could have been considered a deviation from standard credit terms, which at that time were 20% down on closing with the balance to be paid in equal quarterly installments over 10 years. Approval for any deviation had to be obtained from the Central Office. The TWX compares the alternate bid with the fair market value for the parcel.

D.  Memorandum dated June 19, 1962, from the Commissioner, UDS, to The Administrator requesting authority to make awards on the disposal, removed from the Sealed Bid Sale Folder. Due to the dollar value of the disposal, the Administrator's approval of awards was required. The memorandum discusses the bids as compared with fair market value.

E. Memorandum dated June 19, 1962, from Chief, Real Property Division to Assistant Commissioner for Real Property, removed from Sealed Bid Sale Folder. This memorandum is addressed specifically to comparison of the lease-purchase alternate bid on Parcel 3 to the fair rental and fair market values for the parcel and sets out the administrative adjustments made for comparison. This memorandum was used for evaluation of the bid on Parcel 3.

F. Appraisal Report dated May 31, 1961, prepared solely for GSA's use by contract appraiser Fred W. Darnell, MAI, removed from Appraisal Report Folder. This report contains the appraiser's conclusions and supporting data for his appraisal of the Auburn General Depot.

G. Memorandum dated January 31, 1962, from Regional Appraiser to Chief, Real Property Division, removed from Appraisal Report Folder and Appraisal Division Folder No. 3. This memorandum sets forth the fair market value for specific proposed sale parcels and fair rental value for warehouse space.

H. Memorandum dated June 1, 1962, from Regional Appraiser to Chief, Real Property Division, removed from Appraisal Report Folder and Appraisal Division Folder No. 1. This memorandum sets forth the approved fair market values for the specific parcels included in Sale No. 10UR–32. This was the major basis for the bid evaluations for the sale.

I. Memorandum from Director, Appraisal Staff to Regional Director, UDS, dated May 31, 1962, removed from Appraisal Division Folder No. 1. This lists the approved fair market and fair rental values for the parcels included in Sale No. 10UR–32.

J. Reviewer's Appraisal Analysis of the supplemental appraisal report for the sale and lease parcels, removed from the Appraisal Division Folder No. 1. This form contains an analysis of the soundness of the appraiser's methods and conclusions, and lists the fair market and fair rental values for the sale parcels.

K. 101 page Supplemental Appraisal Report dated May 21, 1962, prepared solely for GSA's use by contract appraiser Fred W. Darnell, MAI, covering the specific parcels in GSA Sale 10UR–32. This was a supplement to the report which is exhibit F., and was for the same use.

L. This exhibit contains a number of subunits. Clipped to the folder marked exhibit L, and not further identified, is some GSA correspondence regarding fair market values of the various parcels included in the Auburn General Depot. In addition, there are various separately subnumbered exhibits within the main folder, as follows:

(1) contains an appraisal of the fair market value of some railroad trackage included in the Depot.

(2) contains a memorandum of the Regional Appraiser regarding a valuation of 110 acres of land at the Auburn Depot, including parcels 2 and 3.

(3) contains a TWX from the Chief, Real Property Division, UDS to the Assistant Commissioner for Real Property UDS, comparing fair market values and bids received on the various parcels included in the sealed bid sale. It also includes credit reports on some members of the partnership, prepared by GSA personnel, and a Dun and Bradstreet credit report on the Diamond Ice and Storage Co. furnished by Dun and Bradstreet to GSA in "strict confidence."

(4) GSA correspondence advising the Administrator with regard to the disposal plan and the excess plan.

(5) Report detailing an inspection of the Auburn Depot, dated December 29, 1961.

(6) Appraisal of the fair market value of one of the parcels with the Cold storage plant removed.

As a threshold issue in this case, GSA argues that the records have not been improperly withheld from the plaintiff, since the request for information was made by attorneys on behalf of a partnership known as Auburn Industrial Center, and the plaintiff Benson was never identified to GSA as a member of the partnership.

At the trial, differing versions were developed as to whether GSA had been informed that Benson was a member of the partnership. However, the testimony made it clear that, whatever GSA thought, the attorneys were in fact acting on Benson's behalf when they made the request for records and when they carried up the administrative appeal from the withholding of the records.

Title 5 U.S.C. Section 552(a) (3) provides in part that:

> each agency, on request for identifiable records * * * shall make the records promptly available to any person. On complaint, the district court of the United States * * * has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.

The statute in no place requires that the actual identity of the person for whom the records are sought be revealed to the agency. Further, the statute clearly states that the agency "shall make the records promptly available to any person." Thus the actual identity of the person requesting records which must be made available should be of little importance to the agency under the facts and circumstances of this case. See, Senate Report No. 813, 89th Congress, 1st Session (1965) at pages 5 and 6; House Report No. 1497, 89th Congress, 1st Session (1965) at page 8; the Law Review article by Davis, under the title The Information Act: A Preliminary Analysis, 34 University Chicago Law Review 761 and 765, published 1967; 80 Harvard Law Review 909 to 910, published 1967; Attorney General's Memorandum on the Public Information Section of the Administrative Procedures Act at page 1 (1967); and also Senate Report No. 1219, 88th Congress, 2d Session, page 11 (1964).

Whether GSA knew this was Benson's request, or whether the request was by an agent acting on behalf of the partnership to whom the property involved herein was sold, there has been a request for identifiable agency records, and they have been withheld from the complainant.

In addition, the facts adduced at the trial make it clear that Benson has a special need for these documents. The property purchased by the partnership from GSA, and to which the requested information relates, has been resold. Benson, and other members of the partnership as well, treated the profits from the resale as long-term capital gains on their income tax returns. The Internal Revenue Service is questioning this characterization, and the information contained in the requested documents is needed to clarify the nature of the transaction.

Since Benson has actually demonstrated a special need for the documents, this court need not consider whether he must demonstrate some special need or other reasonable grounds for inquiry in order to persuade the court to exercise the equitable jurisdiction granted the court by the statute.

The next question then is whether the documents which were withheld were withheld improperly.

In this action under Title 5 U.S. C. Section 552(a) (3) the burden is on GSA to sustain its action in withholding the records. And under Section 552(b) nine categories of matters that may properly be withheld are set forth. GSA argues that the withholding of the records sought here was proper because each one was exempt from disclosure un-

der one or more of three exemptions described in subsection (b) of the Act. The paragraphs relied upon as making disclosure inapplicable describe matters:

> "(2) related solely to the internal personnel rules and practices of an agency;
>
> \* \* \*
>
> (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
>
> (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. \* \* \*"

Those last paragraphs are not quoting all the language, but only the material part.

■ It is clear, first of all, that with one exception, paragraph (4) does not apply to any of the material requested here. The agency argues that some of the documents contain financial information obtained from a person, which GSA wishes to keep secret for its own ends and therefore treats as confidential. However, it appears to me that this exemption clearly condones withholding information only when it is obtained from a person outside the agency, and that person wishes the information to be kept confidential. See House Report supra, page 10; Sentate Report supra, page 9; Attorney General's Report at pages 32 to 34; Davis Law Review article supra at pages 787 to 792. Even under this interpretation, the Agency complains that the appraisal report prepared by an outside appraiser under contract to GSA would be treated as confidential by the appraiser, and thus GSA should not have to disclose it. However, the exemption is meant to protect information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express or implied promise by the government that the information will be kept confidential. The appraisal report, on the other hand, is kept confidential by the appraiser on the client's behalf, not on his own behalf, and the client here is GSA. Thus the exemption does not apply to the appraisal report.

■ The one instance in which the paragraph (4) exemption does apply to this case is with regard to the Dun and Bradstreet report contained within exhibit L(3). That report is prepared on a printed form which states that it is provided by Dun and Bradstreet in strict confidence. It is therefore "financial information obtained from a person and confidential," and GSA need not disclose it to Benson.

None of the material requested here is "related solely to the internal personnel rules and practices of an agency," so as to be exempt from disclosure under paragraph (2). The phrase "internal personnel" modifies both "rules" and "practices" in that paragraph. The Senate Report on this bill said:

> "Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like." Senate Report at page 8.

This language is consonant with the plain words of the statute, which seem to provide an exemption for material dealing solely with the physical management of the agency's work force.

The House Report states that exemption (2) covers:

> "Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all 'matters of internal management' such as employee relations and working conditions and routine administrative procedures which are withheld under the present law." House Report at page 10.

To some extent, this interpretation contradicts that given by the Senate Report. The House Report accompanied the bill on its passage through the House of Representatives, after the bill had already passed the Senate. It therefore seems to me that it represents the thinking of only one house, and to the extent that the two reports disagree, the surer indication of congressional intent is to be found in the Senate Report, which was available for consideration in both houses.

■ In any event, legislative history is only a guide to the interpretation of statutory language.

"Internal personnel rules and practices" are rules and practices of general application relating to such matters as employee use of the employer's plant and equipment, and the amount of time in each working day which is to be devoted to the employer's business and such activity. None of the information sought here relates to such matters, to say nothing of relating *solely* to such matters.

■ Next GSA contends that the documents at issue here are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," and are thus exempt, under paragraph (5) of subsection (b) of the Act, from disclosure requirements of the statute.

The House Report interpreted this language to say that "any internal memorandum which would routinely be disclosed to a private party through the discovery process in litigation with the agency would be available to the general public." House Report, page 10. GSA interprets the word "routinely" in the House Report to mean that such memorandums or letters need be produced only if GSA would release them as a matter of course, without resisting discovery requested by a private party opponent.

The word "routinely" does not appear in the statute, nor does it appear in the Senate Report. Even when it is used in the House Report, it carries a different meaning than GSA would argue: That is, inter-agency and intra-agency memorandums or letters are subject to the disclosure requirements of the statute if a court would "routinely" order them produced in discovery proceedings instituted by a private party litigant.

It is thus irrelevant whether GSA would or would not routinely grant access to these documents.

Under the statute, GSA has the burden in this suit of sustaining its action in refusing to produce the documents in question. They are attempting to do so by claiming that the documents are exempted from the sweep of the statute under paragraph (5) of subsection (b) of the statute.

Under a strict construction, GSA could prove that the documents are exempted under section (b) (5) by showing that there is no type of litigation between the agency and a private party in which the court would order production of the documents in appropriate discovery proceedings. This proposition is a universal negative, which is difficult to establish. And the statute does not place upon GSA the burden of proving that universal negative, but of sustaining its action. GSA can do this by showing that there are actions in which the documents would be sought in discovery proceedings, but in the normal sort of action in which the documents might be of value, courts would not order the documents produced. At this point, the burden would shift to the plaintiff at least to come forward with a theory of an action in which a court would order the documents produced.

These documents, as described by the evidence in this case, deal with a sale of real estate and the negotiations surrounding the sale.

During the course of trial, only two types of litigation which might involve such matters were referred to. These were condemnation proceedings and litigation surrounding a contract or purported contract for the sale of lands.

Condemnation actions are not in point as actions in which these documents would be of value, since these documents concern property which GSA was attempting to dispose of rather than acquire. There is thus no conceivable condemnation action in which these documents would be sought in discovery proceedings.

The evidence and argument at trial showed that, in litigation surrounding a purported sale of the lands, the documents could well be sought by a private party in litigation with GSA. If for any reason there would be a resort to parol evidence in the action, such as to show the meaning intended by the parties in an ambiguous contract, the working papers of the GSA negotiators would be most valuable evidence.

If such a situation arose, a court would as a matter of course compel GSA to disclose the documents in discovery proceedings, insofar as they pertain to the properties purchased by the purported sale.

In such a situation, if the documents in question contained information regarding other lands which would be subject to future sale, the court would probably enter some sort of protective order allowing such information to be kept secret when information regarding the sale property was disclosed.

GSA relies on Kaiser Aluminum & Chemical Corp. v. United States, 157 F. Supp. 939, 141 Ct.Cl. 38 (1958), an opinion by Justice Reed, sitting by designation, which declined to order production of an advisory opinion rendered to The Liquidator of War Assets by a subordinate. In that case the Administrator of the General Services Administration had made a claim of executive privilege for the document. The court held that documents of that kind can be privileged from disclosure under the executive privilege, but that this privilege was not absolute, and whether the privilege could properly be claimed must be evaluated on a case-by-case basis.

There may be some question whether this evaluation is to be made by the person claiming executive privilege or by the court to which the claim is made. In addition, it is not at all clear to what extent, if any, the new Public Information Act affects the existence of the executive privilege or the weight which is now to be attached to various factors in deciding whether the privilege will be claimed or recognized. See the Davis Law Review article, supra, pages 792 to 793. Also, 41 C.F.R. section 105–60.603 states that executive privilege is reserved for use by the President only. Where such uncertainty exists and where, as here, there has been no unequivocal statement that a claim of executive privilege would be made on behalf of these documents if they were sought in discovery proceedings by a private party in litigation, this court cannot find that GSA has carried its "burden * * * to sustain its action."

Since GSA has not met its burden of sustaining its action and failing to disclose the documents, plaintiff Benson is entitled to an order enjoining GSA from withholding the requested records, which are contained in defendant's exhibits A through L, and directing that they be produced. Some parts of these exhibits need not be produced, however, since the plaintiff has not asked for them, and GSA has indicated it would prefer not to reveal them. The parts which need not be produced are those records or parts of records which refer to parcels other than parcels two or three, as they are numbered in the sale which led to this action, and which do not refer to parcels two and three. All parts of exhibits A through L which have any reference to parcels two and three or the sale thereof must be produced, except for the Dun and Bradstreet report in exhibit L(3), which has been referred to earlier in the Court's memorandum opinion.

The plaintiff, having prevailed in this action, is entitled to costs.

On the other hand, the defendant may charge the plaintiff a "fair and equita-

ble" fee for providing the requested records, including a "fair and equitable" fee for the deletion of such matters not ordered to be produced which the agency may wish to delete from the copies provided to the plaintiff. Such fees are provided for in 41 C.F.R. Section 105–60.303(e). However, no charge is to be made which is referable to any steps taken under court order or otherwise in defense of this case.