BOARD OF TRADE OF the CITY
OF CHICAGO

v.

COMMODITY FUTURES TRADING
COMMISSION, Appellant.

No. 78–1089.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 23, 1979.

Decided May 13, 1980.

Jeffrey Axelrad, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, Barbara Allen Babcock, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellant.

Mahlon M. Frankhauser, Washington, D. C., with whom David R. Schwiesow, Washington, D. C., was on the brief, for appellee.

Before ROBINSON and ROBB, Circuit Judges, and RICHEY *, United States District Judge for the District of Columbia.

Opinion for the Court filed by ROBINSON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This case is the aftermath of the Commodity Futures Trading Commission's refusal to divulge to the Board of Trade of the City of Chicago the identities of "trade sources" who have supplied information to the Commission concerning the Board's plywood futures contract. The Commission argues that its release of all materials in its possession, but with identifying details deleted, is in full compliance with the disclosure requirements of the Freedom of Information Act,[1] assertedly because these excisions are permitted by Exemptions 4[2] and 6[3] of the Act. The District Court granted the Board's motion for judgment on the pleadings[4] and ordered full disclosure on the ground that neither exemption justifies the deletions. We affirm the District Court's conclusion that the Commission's reliance on Exemption 6 is misplaced,[5] but remand for further consideration of the Exemption 4 claim.[6]

## I. BACKGROUND

The information in dispute was acquired by the Commission[7] in the course of an investigation undertaken to ensure the continued conformance of the Board's plywood futures contract[8] with statutory standards[9] and Commission guidelines. Plywood futures were first traded on the Board in 1969, and the exchange was designated as the contract market for the commodity in 1974.[10] Pursuant to its statutory responsibility for overseeing contracts for the sale of commodities for future delivery traded or executed on boards of trade or commodi-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Pub.L. No. 89–554, 80 Stat. 383 (1966), 5 U.S.C. § 552 (1976) [hereinafter cited as codified].

2. 5 U.S.C. § 552(b)(4), quoted in text *infra* at note 61.

3. 5 U.S.C. § 552(b)(6), quoted in text *infra* at note 21.

4. *Board of Trade v. CFTC*, No. 77–560, at 4 (D.D.C. Oct. 28, 1977), App. 136, 139. The Commission had moved for summary judgment, but the court denied that motion and instead awarded judgment on the pleadings in the Board's favor—precisely what the latter had sought. Since, however, the record contains matter outside the pleadings highly relevant to the issues, it may be that the Board's motion should more properly have been taken as one for summary judgment. See Fed.R. Civ.P. 12(c). We so treat the Board's motion in order that we may give the record before us its broadest consideration. See text *infra* at notes 83–85.

5. See Part II *infra*.

6. See Part III *infra*.

7. The Commodity Futures Trading Commission is an independent regulatory agency created by the Commodity Futures Trading Act of 1974. Commodity Exchange Act, 42 Stat. 998 (1922),

as amended by the Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389, 7 U.S.C. §§ 1 *et seq.* (1976) [hereinafter cited as codified].

8. Initially, the Commission sought reports from the Board on both the plywood and stud lumber futures contracts. The request was withdrawn with respect to the latter after the Commission was informed that stud lumber futures were no longer actively traded on the Board. See Letter from Warren W. Lebeck, President of the Chicago Board of Trade, to Stanley S. Ostrowski, Acting Director of the Market Analysis Division of the CFTC, July 12, 1976, Appendix (App.) 21; Letter from Mark J. Powers, Chief Economist of CFTC, to Warren W. Lebeck, President of the Chicago Board of Trade, Sept. 8, 1976, App. 23.

9. It is unlawful to offer for sale or to effect the sale of a futures contract otherwise than "by or through a member of a board of trade which has been designated by the Commission as a contract 'market'" for that commodity. 7 U.S.C. § 6 (1976).

10. A board of trade seeking designation as a contract market must "demonstrate[] that transactions for future delivery in the commodity for which designation as a contract market is sought will not be contrary to the public interest." 7 U.S.C. § 7(g) (1976). In addition to meeting this statutory standard, the board must comply with Commission guidelines.

ty exchanges,[11] the Commission has established guidelines for approval of such contracts for trading: each must serve a reasonable economic purpose, its terms and conditions must be commercially viable, and the contract designation must not be contrary to the public interest.[12] The Commission periodically conducts investigations to determine whether existing commodities futures contracts meet these requirements.

The inquiry into the plywood futures contract focused particularly on its delivery provisions, a subject with respect to which the Commission had received several complaints.[13] Criticisms and proposed alternatives were solicited from persons utilizing the contract, and at least some of those who responded did so with the understanding that their identities would be kept confidential.[14] Subsequent to these consultations, the Commission requested a report from the Board concerning the contract's shipping certificate specification. The Commission received this report, but when it called for a more detailed analysis of the certificate—obliging the Board to respond to complaints by "trade sources," to "discuss the legitimacy of [enumerated] trade-alleged problems," and to consider "industry-proposed alterna-

tives" to the current shipping certificate[15] —the Board declined to comply. The basis for the Board's refusal was its contention that the "analysis could properly be made only if the sources of the criticisms and proposed alternatives were identified and the data supporting the proposals were made available for review."[16]

The Board then engaged in a series of informal attempts to acquire the names and supporting facts from the Commission. When these efforts failed, the Board made a formal Freedom of Information Act request for any "data or analysis  .  .  . submitted or developed in connection with the 'industry-proposed alternatives,' " as well as the identity of the so-called "trade sources"—including persons who had complained of "trade-alleged problems" and those who had offered "industry-proposed alternatives."[17] In response, the Commission's Office of Public Information decided to release the documents in its possession related to the inquiry but with all identifying details excised,[18] a decision affirmed on appeal within the agency.[19] The Commission justified these deletions on the basis of Exemptions 4 and 6 of the Act.[20] Follow-

---

11. See 7 U.S.C. § 2 (1976).

12. Commodity Futures Law Reports ¶ 20,041, at 20,619 (CCH 1975), App. 58.

13. For example, in a letter seeking information from the Board, the Commission related that "trade sources [had] complained to the CFTC that nonconvergence has discouraged hedging activity in plywood." Letter from Stanley S. Ostrowski, Acting Director of the Marketing Analysis Division of CFTC, to Warren W. Lebeck, President of the Chicago Board of Trade, July 9, 1976, at 1, App. 18. The same letter also advised the Board that the Commission had received allegations to the effect that "regular warehousemen (particularly public warehousemen who do not merchandise plywood in the cash market) incur losses on inbound freight when certificate holders elect to keep plywood in store for longer than a year." Id. at 2, App. 19.

14. "The interviews were conducted under the express or implied understanding that the identities of the interviewees would be held in confidence." Brief for Appellants at 15.

15. Ostrowski-Lebeck letter, supra note 13, at 1–2, App. 18–19. Complaint at 6 ʽ 11, App. 12.

16. Brief for Appellee at 5.

17. Letter (FOIA request) from Mahlon M. Frankhauser, Attorney for the Chicago Board of Trade, to De Van L. Shumway, Director of CFTC Office of Public Information, Nov. 8, 1976, at 2, App. 27.

18. Letter from Ray K. Schleeter, Deputy Director of CFTC Office of Public Information, to Mahlon M. Frankhauser, Attorney for the Chicago Board of Trade, Nov. 30, 1976, App. 28.

19. Letter from Richard E. Nathan, Acting General Counsel of CFTC, to Mahlon M. Frankhauser, Attorney for the Chicago Board of Trade, Jan. 26, 1977, App. 37. The Commission upheld the denial by its Office of Public Information of the Board's request for identities of the trade sources, but ordered the release, with identifying details omitted, of documents from an additional file discovered after the initial documents were turned over to the Board.

20. 5 U.S.C. §§ 552(b)(4), 552(b)(6), quoted in text infra at notes 61 and 21, respectively.

ing receipt of the redacted documents, the Board commenced this litigation in the District Court.

## II. EXEMPTION 6

Exemption 6 of the Freedom of Information Act removes from coverage "matters that are . . . personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[21] An agency predicating denial of a request for information on Exemption 6 must demonstrate that both prongs of this statutory test are satisfied.[22] In the instant case, the District Court looked first to the question whether the materials sought by the Board constituted "personnel," "medical," or "similar files," and found that "[t]he Government [had made] no pretense that they [were]."[23] Without reaching the invasion-of-privacy question, the court then held that the Commission's refusal to supply the identities of the trade sources could not be justified by reliance on Exemption 6.[24]

The Commission argues that the District Court's ruling is erroneous because release of the identities would infringe upon privacy interests similar to those protected by the statutory liberation of personnel files from disclosure. In support of this contention, the Commission opines that if the names of the trade sources are made public, these "individuals may find themselves subject to pressure from their colleagues or from persons with whom they do business";[25] moreover, in the Commission's view, there is a "strong possibility that [the Board] will contact the sources and attempt to pressure them" as well.[26] Consequently, the Commission asserts that the interests at stake are of the magnitude of those Congress intended to safeguard by the "similar files" language of Exemption 6.

■ We agree with the District Court that Exemption 6 does not shield the information sought by the Board. The dispositive inquiry with respect to the Commission's claim is whether the desired information is contained in documents that are "similar files" within the purview of the exemption,[27] since they clearly are neither medical nor personnel records. We hold that they are not similar files either.

In reaching this conclusion, we have detected some apparent inconsistency in our earlier decisions as to the precise manner of approach to the problem. In *Rural Housing Alliance v. United States Department of Agriculture*,[28] we indicated that the question whether materials withheld on the basis of Exemption 6 is a similar file within the meaning thereof must be answered before the court will undertake to balance the personal privacy interests involved against the public interest in the free availability of

---

**21.** 5 U.S.C. § 552(b)(6) (1976).

**22.** See, *e. g.*, *Ditlow v. Shultz*, 170 U.S.App. D.C. 352, 355, 517 F.2d 166, 169 (1975), *Rural Housing Alliance v. Department of Agriculture*, 162 U.S.App.D.C. 122, 126, 498 F.2d 73, 77 (1974); *Getman v. NLRB*, 146 U.S.App.D.C. 209, 213, 450 F.2d 670, 674, *stay denied*, 404 U.S. 1204, 92 S.Ct. 7, 30 L.Ed.2d 8 (1971) (Justice Black, as Acting Circuit Justice); *Wine Hobby USA, Inc. v. IRS*, 502 F.2d 133, 135 (3d Cir. 1974); Note, *The Freedom of Information Act: A Seven-Year Assignment*, 74 Colum.L. Rev. 895, 953 (1974).

**23.** *Board of Trade v. CFTC*, *supra* note 4, at 4, App. 139.

**24.** *Id.*

**25.** Brief for Appellant at 21.

**26.** Reply Brief for Appellant at 17.

**27.** The Third Circuit has held that a list of names and addresses is a "file" within the meaning of Exemption 6. *Wine Hobby USA, Inc. v. IRS*, *supra* note 22, 502 F.2d at 135. Although we have had occasion to assume arguendo that such a list would be a "file," *Getman v. NLRB*, *supra* note 22, 146 U.S.App.D.C. at 213, 450 F.2d at 674, we have yet to decide that question, and we do not reach it in this case. The identities here are not simply a list of names; rather, they are linked to specific comments on the functioning of the Board of Trade. In this context, names take on a far different character than they do in a compilation such as the list of employees in *Getman*. For the facts of *Getman*, see note 33 *infra*. See also note 69 *infra*.

**28.** *Supra* note 22.

information.[29] Conversely, in *Getman v. NLRB*[30] and *Ditlow v. Shultz*,[31] we engaged almost immediately in weighing such competing concerns in situations involving relatively minor losses of privacy.[32] Careful analysis, however, reveals that *Getman* looked to the relative importance of public and private interests only after assuming arguendo that the data sought[33] could be characterized as personnel, medical or similar files;[34] regardless of their status as such, we held that their release would not result in a clearly unwarranted invasion of privacy, and that withholding was therefore unsupportable under Exemption 6.[35] In *Ditlow*, where an information-requester sought an injunction, pending his appeal from an adverse judgment, to restrain the agency from destroying the records concerned, as was customarily done after a given period of time, we noted the complex issues presented and recognized the differing approaches of *Getman* and *Rural Housing*.[36] Without drawing any conclusions or attempting to resolve the dissimilarity, we weighed the competing interests—despite our view that the privacy concerns involved

were minimal—and held that the supplicant's "challenge to the District Court's dismissal of his FOIA action [was] sufficiently substantial to warrant an order requiring the [agency] to preserve the requested customs forms to avoid mooting the case,"[37] pending resolution of the merits of the appeal.[38]

The differences between *Getman* and *Rural Housing* discerned in *Ditlow* are more apparent then real, however. There is, to a large extent, an essential interrelationship between the question whether information to which access is denied under the aegis of Exemption 6 is "similar" to personnel or medical files and the inquiry whether disclosure of the information would result in an unwarranted invasion of privacy. In the first instance, both questions turn on whether the facts that would be revealed would infringe on some privacy interest, for the very purpose of this exemption is "to protect certain  .  .  .  important rights of privacy" of individuals.[39] Once it is ascertained that such an

---

**29.** See 162 U.S.App.D.C. at 125–126, 498 F.2d at 76–77.

**30.** *Supra* note 22.

**31.** *Supra* note 22.

**32.** See 170 U.S.App.D.C. at 356, 517 F.2d at 170.

**33.** In *Getman, supra* note 22, a group of law professors engaged in a labor voting study sought a number of *Excelsior* lists—names and addresses of employees eligible to vote in certain representation elections, maintained by the National Labor Relations Board pursuant to its decision in *Excelsior Underwear, Inc.*, 156 N.L.R.B. 1236 (1966)—in the Board's possession in order to facilitate contact with employees who voted in specific elections. The Board denied the request, relying on Exemptions 4, 6 and 7, 5 U.S.C. §§ 552(b)(4), 552(b)(6), 552(b)(7) (1976).

**34.** 146 U.S.App.D.C. at 213, 450 F.2d at 674.

**35.** *Id.* at 216, 450 F.2d at 677.

**36.** *Ditlow v. Shultz, supra* note 22, 170 U.S. App.D.C. at 356, 517 F.2d at 170. Ditlow had previously initiated an antitrust suit against ten airlines, alleging overcharges for transpacific flights to the United States between May 1 and September 1, 1973. The District Court dis-

missed that action, and at the time *Ditlow v. Shultz* was decided the appeal of the dismissal of the antitrust case was pending in this court. Ditlow planned to seek certification of the antitrust litigation as a class action if he succeeded in obtaining a reversal on the appeal therein, and in order to discover the names and addresses of the class members, he sought access pursuant to the Freedom of Information Act to United States customs declaration forms filled out by travelers returning from Asia and Australia during the period in question. The Secretary of the Treasury denied Ditlow's request, and he appealed to this court. Because there was a substantial likelihood that the customs forms would be destroyed—as they regularly were—before either appeal was decided, Ditlow moved for an injunction to preserve them. We granted the injunction pending further developments in the antitrust litigation. *Id.* at 359–360, 517 F.2d at 173–174.

**37.** *Id.* at 359, 517 F.2d at 173.

**38.** *Id.*

**39.** See note 41 *infra*. The Commission relies heavily on *Wine Hobby U.S.A., Inc. v. United States, supra* note 22, where a Pennsylvania corporation sought access to the names and addresses of all persons registered with the

interest exists, it must be determined whether it is of the same magnitude—as highly personal or as intimate in nature—as that at stake in personnel and medical records. If the personal quality of the information rises to this level, then it is "similar" to personnel and medical files within the meaning of Exemption 6.[40]

Once this first prong of the statutory test in met, the court must proceed to weigh the privacy concerns against the public interest in general disclosure. If the balance favors the privacy element, the agency is justified in withholding the data; if the interests of the public in full revelation are stronger, the information must be released; and if the weights are approximately equal, the court must tilt the balance in favor of disclosure, the overriding policy of the Act.[41]

It is not always necessary to consider the issues in the order above-discussed, however. In some cases it may be readily apparent to the court that the balance required by the second prong of the test calls clearly for divulgence because, whatever the precise nature of the privacy interest, it is evident that the public benefit gained from making information freely available is far greater. In such instances the court may find that the question whether release of the information would constitute an un-

warranted invasion of privacy is simpler to answer than the question whether it constitutes "personnel and medical [or] similar files."[42] If so, the court may well dispose of the matter on the basis of the second facet of the test.

When viewed in this light, any apparent inconsistencies in our earlier opinions disappear. In *Rural Housing*, we employed a straight-forward approach: the documents sought were determined to be within the scope of the "similar files" language of Exemption 6, and the case was remanded for further consideration of the invasion-of-privacy issue.[43] In *Getman*, discerning whether the information fell within the "similar files" language proved to be more difficult than the question whether its release would result in a plainly unreasonable invasion of the rights of the individuals involved;[44] consequently we found it more expeditious to dispose of the case on the basis of the agency's failure to satisfy the second branch of the test.[45] In *Ditlow* we were faced with the need to decide quickly whether to grant an injunction prohibiting destruction of the sought-after records, and in those circumstances we concluded that it would not be a necessary or appropriate use of judicial power to furnish, on the motion for an injunction, answers to the complex

---

United States Bureau of Alcohol, Tobacco and Firearms as producers of wine for family use in the Mid-Atlantic region. The Third Circuit reversed a district court decision that the names and addresses were not protected from disclosure under Exemption 6 because that ruling was rested on the thesis that such a list is not a "file" within the meaning of the exemption. We find it unnecessary to decide whether names constitute "files" because the crucial element here is the linkage of the names with the information in the documents that contain them. See note 22 *supra*.

**40.** See text *supra* at note 21.

**41.** The Senate Report states:
It is the purpose of the present bill . . to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.
. . .
\* \* \* \* \* \*
At the same time . . . it is necessary to protect certain equally important rights of

privacy with respect to certain information in Government files. . . .
\* \* \* \* \* \*
It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure.
S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965).

**42.** See text *supra* at note 21.

**43.** *Rural Housing Alliance v. United States Dep't of Agriculture, supra* note 22, 162 U.S. App.D.C. at 127, 498 F.2d at 78.

**44.** *Getman v. NLRB, supra* note 22, 146 U.S. App.D.C. at 213, 450 F.2d at 674.

**45.** *Id.* at 216, 450 F.2d at 677.

questions that would ultimately determine whether the data in dispute would be revealed. Accordingly, we granted the injunction pending future developments.[46]

In the case at bar, the District Court, following the *Rural Housing* approach, focused on the first prong of the statutory test, and reached its decision with respect to the Exemption 6 claim on the ground that the identities of the Commission's trade sources are not "similar files" within the meaning of the exemption.[47] We agree.

In previous cases, we have held that Exemption 6 "was designed to protect individuals from public disclosure of intimate details of their lives, whether the disclosure be of personnel files, medical files, or other similar files."[48] Although in *Rural Housing* we noted that the exemption "is phrased broadly to protect individuals from a wide range of embarrassing disclosures,"[49] it is clear from the context of that statement that the "embarrassing disclosures" of which we spoke are those that involve "intimate personal details." Employing this formulation, we have held that "information regarding marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights [and] reputation" is within the purview of Exemption 6.[50] Similarly, Air Force Acade-

my case summaries of honors and ethics hearings fall within the exemption[51] to the extent that they may only be released after deletion of identifying details.[52] In contrast, names and addresses of employees eligible to vote in labor representation elections are not exempt,[53] nor are names and addresses of persons whose homes were built on uranium tailings.[54]

Applying this test in the instant case, we conclude that the records incorporating the data sought by the Board of Trade are not "similar files" within the contemplation of Exemption 6. The information which the Commission withheld—identification of trade sources criticizing the shipping provisions of the plywood futures contract or proposing alternatives thereto—reveals no more than how particular persons connected with the Board view its functioning with respect to the plywood futures contract. To be sure, there may be some slight privacy interest involved here—insofar as release of identifying details would expose the occupations of these sources, their relationship to the Board, and how they perceive the workings of the market enterprise from which they derive at least part of their livelihood.[55] But the fact remains that the withheld information associates these individuals with business of the Board, and not

46. *Ditlow v. Shultz, supra* note 22, 170 U.S. App.D.C. at 359–360, 517 F.2d at 173–174.

47. *Board of Trade v. CFTC, supra* note 4, App. 4, App. 139.

48. *Rural Housing Alliance v. United States Dep't of Agriculture, supra* note 22, 162 U.S. App.D.C. at 126, 498 F.2d at 77; see *Robles v. EPA,* 484 F.2d 843, 845 (4th Cir. 1973) (the term "similar files" applies only to "information which relates to a specific person or individual, to 'intimate details' of a 'highly personal nature' in that individual's employment record or health history or the like").

49. *Rural Housing Alliance v. United States Dep't of Agriculture, supra* note 22, 162 U.S. App.D.C. at 126, 498 F.2d at 77.

50. *Id.*

51. *Department of Air Force v. Rose,* 425 U.S. 352, 376–377, 96 S.Ct. 1592, 1606–1607, 48 L.Ed.2d 11, 30–31 (1976).

52. *Id.* at 380–382, 96 S.Ct. at 1608–1609, 48 L.Ed.2d at 32–33.

53. See *Getman v. NLRB, supra* note 22, 146 U.S.App.D.C. at 213–215, 450 F.2d at 674–676 (suggesting that such information is not a similar file, but holding that even if it were, release would not be a "clearly unwarranted invasion of privacy").

54. See *Robles v. EPA, supra* note 48, 484 F.2d at 845–848 (suggesting that such records are not similar files, but holding that in any event release would not constitute a "clearly unwarranted invasion of privacy").

55. The Board claims that the "trade sources" are corporation personnel rather than persons acting in their individual capacities. Brief for Appellee at 32 n.22. The Commission has not responded to this allegation.

with any aspect of their personal lives. The interest in non-disclosure thus asserted is not in continued privacy of personal matters, but in anonymity of criticism on purely commercial matters.[56] Certainly no fact of an intimate nature is likely to be revealed by providing the Board of Trade with access to the names of those who censured the shipping provisions or proposed alternatives.[57] Consequently, we agree with the District Court that the identities of the trade sources do not constitute "similar files" within the ambit of Exemption 6.

Moreover, even were we to reach the stage of balancing in this case,[58] we could not say that the privacy interests asserted by the Commission outweigh the public interest in complete disclosure of the governmental documents at issue. The Commission's allegation that access to the information identifying the trade sources would undermine its ability to make independent assessments of the functioning of the Board of Trade as a commodity futures exchange is not germane to the character of the privacy interests involved. The only remaining interest in withholding trade-source identities advanced by the Commission is avoidance of possible harassment of those sources by the Board or others with whom they work and associate. In support of this apprehension, the Commission cites the affidavit of the president of the Board, who professed a concern in finding out why these individuals chose to go to the Commission rather than to employ the Board's own established grievance and suggestion procedures.[59] Whether or not it is within the realm of the Commission's expertise to equate the exchange president's desire for talks with a strong potential for harassment, we find it difficult to believe that the Commission could not utilize its broad regulatory powers to prevent any improper conduct on the part of Board representatives. At any rate, we are not persuaded by the Commission's claim that divulgence of withheld materials serving to identify the trade sources "would constitute a clearly unwarranted invasion of personal privacy." [60]

## III. EXEMPTION 4

Exemption 4 of the Freedom of Information Act relieves from mandatory disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." [61] In response to the Commission's contention that this exemption authorizes withholding of the trade source identities, the District Court ruled that

> this is not an Exemption 4 case. The legislative history of Exemption 4 indicates that the provision was intended to shield information "obtained by the Government through questionnaires or other inquiries, but which would *customarily not be released to the public* by the person from whom it was obtained." . .
>
> In view of the fact that the Commission

---

56. Whether purely commercial information is protected from disclosure turns on the applicability of Exemption 4, 5 U.S.C. § 552(b)(6) (1976). See Part III *infra.*

57. In support of its argument that the names and details tending to identify the trade sources are shielded by Exemption 6, the Commission also cites two Third Circuit cases, *Committee on Masonic Homes v. NLRB*, 556 F.2d 214 (3d Cir. 1977), and *Wine Hobby USA, Inc. v. IRS, supra* note 22. In *Committee on Masonic Homes* union cards revealing employee names, addresses, union affiliations and job descriptions were held to be "similar files," 556 F.2d at 220, and in *Wine Hobby USA* completed forms in the possession of the Bureau of Alcohol, Tobacco and Firearms were held to be exempt because, in addition to the name of each registrant, the forms divulged his or her address, family status and the fact that winemaking activities were being conducted by the household. 502 F.2d at 137. In the instant case, however, we are not called upon to decide such arguably close questions. The disputed identities are linked to financial and commercial information regarding the business of the Board of Trade, see text *supra* at notes 54–56, rather than to the types of personal details at issue in the above situations.

58. See text *supra* at notes 28–42.

59. Affidavit of Warren W. Lebeck, at 4–5, App. 104–105.

60. See text *supra* at note 21.

61. 5 U.S.C. § 552(b)(4) (1976).

has already disclosed the financial and commercial portion of the gathered information, it cannot now claim that it is the type "not customarily released to the public." And since the names and identifying details are not "independently confidential within the meaning of Exemption 4," . . . they must be disclosed unless protected by a different exemption.[62]

We think the District Court's reasoning reflects a fundamental misunderstanding both of the proper method of analysis to be employed and the appropriate standards to be utilized in evaluating a claim that material falls within Exemption 4.

■ Procedurally, when faced with a question of Exemption 4 coverage, the determining body—agency or court—must first examine the "requested [documents], with details identifying the [suppliers] not deleted,"[63] and ascertain whether they contain protected information. If, after applying the appropriate tests,[64] the body concludes that all or part of the sought-after material is shielded by this exception to the Act, it must then determine whether suitable deletions of identifying or exempt matter may be made which will enable it to reveal the remaining information. This technique, which we have employed in numerous cases,[65] derives from express provisions of the Act and its legislative history as well.

The Act has always specified that "[t]o the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, or staff manual or instruction."[66] More broadly, the Act, as amended in 1974, mandates that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."[67] Beyond that, the courts have relied on the Act's overriding policy in

62. *Board of Trade v. CFTC, supra* note 4, at 3, App. 138, first quoting S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965) (emphasis added), and then quoting *Fisher v. Renegotiation Bd.*, 153 U.S.App.D.C. 398, 402, 473 F.2d 109, 113 (1972) (footnotes omitted).

63. *Fisher v. Renegotiation Bd., supra* note 62, 153 U.S.App.D.C. at 402, 473 F.2d at 113.

64. See text *infra* at notes 76–82.

65. See *Pacific Architects & Eng'rs, Inc. v. Renegotiation Bd.*, 164 U.S.App.D.C. 276, 278, 505 F.2d 383, 385 (1974) (after applying Exemption 4 tests, "the agency resisting disclosure must" consider "the extent to which any harm[ ] [to confidentiality interests] could be reduced or eliminated by non-disclosure of the identity of the person submitting the information in dispute"); *Rural Housing Alliance v. United States Dep't of Agriculture, supra* note 22, 162 U.S.App.D.C. at 128, 498 F.2d at 79 (case remanded for application of Exemption 4 tests; District Court cautioned that although "several of our Circuit's cases support the idea of deletions to permit disclosure of the remainder of [a] report, we fear that" on the facts of this case "deletions are ineffective to protect the privacy and confidentiality of the individuals involved"); *Fisher v. Renegotiation Bd., supra* note 62, 153 U.S.App.D.C. at 402, 473 F.2d at 113 (case remanded for determination "whether the commercial and financial data contained in the requested opinions and orders, with details identifying the contractors not deleted, were independently confidential within the meaning of Exemption 4. If . . . any of such information is exempt from disclosure, then the deletion of the identifying details which have been made by the Board shall not be disturbed, since such information has already been disclosed in this case."); *Soucie v. David*, 145 U.S.App.D.C. 144, 155–156, 448 F.2d 1067, 1078–1079 (1971) ("[i]f the [requested] Report contains material protected by [Exemption 4], then that material should be deleted before disclosure of the remainder may be required."); *Bristol-Myers Co. v. FTC*, 138 U.S. App.D.C. 22, 25–26, 424 F.2d 935, 938–939, *cert. denied*, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970) ("[t]he court may well conclude that portions of the requested material are protected [by Exemption 4], and it may be that identifying details or secret matters can be deleted from a document to render it subject to disclosure."). *Cf. Department of Air Force v. Rose, supra* note 51, 425 U.S. at 373–375, 378–382, 96 S.Ct. at 1607–1609, 48 L.Ed.2d at 30–31 (taking same approach in Exemption 6 context).

66. 5 U.S.C. § 552(a)(2) (1976).

67. 5 U.S.C. § 552(b) (1976).

favor of disclosure[68] to require eradication of identifying details—not exempt in themselves[69]—when such an excision renders otherwise exempt material disclosable.[70] The Senate cited this approach with approval in its report accompanying the 1974 amendments to the Act,[71] noting that under the new "segregable portion" provision courts must "examine the records themselves and require the release of portions to which the purposes of the exemption under which they are withheld does not apply."[72] The Supreme Court has placed the stamp of its approval on this technique by requiring disclosure of information, after deletion of identifying details, that otherwise would have been protected by Exemption 6.[73]

■ In the case before us, the Commission attempted to follow this procedure. Having concluded—correctly or incorrectly—that the requested material was exempt, the Commission, while still asserting the right to preserve the confidentiality of

its sources under Exemption 4, laudibly sought to reveal as much information as it could. The District Court, however, made separate evaluations of the deleted identities and the released criticisms and alternative proposals supplied by the trade sources. Concluding that neither type of information, standing alone, fell within Exemption 4, the court ordered divulgence of the withheld sources.

The District Court's approach failed to recognize that although some commercial and financial information remains confidential in nature even after the identity of its source has been extirpated,[74] a significant portion of the information protected by Exemption 4 derives its exempt status wholly from its relationship to a particular person or commercial enterprise, and that, stripped of its identifying features, it takes on the character of statistics. The District Court was undoubtedly correct in its conclusion that, viewed independently, the names of the sources are neither "confidential" nor

---

68. See note 41 *supra.*

69. See *Fisher v. Renegotiation Bd., supra* note 62, 153 U.S.App.D.C. at 402, 473 F.2d at 113 ("[t]he question is one of confidentiality under Exemption 4. Identifying details . . . do not so qualify in and of themselves"); *Getman v. NLRB, supra* note 22, 146 U.S.App.D.C. at 212, 450 F.2d at 673 ("[o]bviously, a bare list of names and addresses of employees . . . which cannot be fairly characterized as 'trade secrets' or 'financial' or 'commercial' information is not exempted from disclosure by Subsection (b)(4)."). Thus, in the instant case, had the Board clearly sought only a list of trade source interviewees, this information would probably have not been immunized by Exemption 4. The Board's demand, however, included the following language:

Pursuant to the Freedom of Information Act . . . we hereby request copies of any Commission records or other records in the Commission's possession that reflect, relate or refer to the complaints from "trade sources," the "trade alleged problems" and the "industry proposed alternatives. . . ."

Freedom of Information Act Request at 1, App. 26. The Board treated the request as one for the underlying records and not just for the trade-source identities. See Letter from Ray K. Schleeter, Deputy Director of CFTC Office of Public Information, to Mahlon M. Frankhauser, Attorney for the Board of Trade of the City of Chicago at 1 (Nov. 30, 1976), Apr. 28.

70. See *Pacific Architects & Eng'rs, Inc. v. Renegotiation Bd., supra* note 65; *Rural Housing Alliance v. United States Dep't of Agriculture, supra* note 22; *Bristol-Myers Co. v. FTC, supra* note 65.

71. S.Rep. No. 854, 93d Cong., 2d Sess. 31 (1974) (" '[t]he court may well conclude that portions of the requested material are protected, and it may be that identifying details or secret matters can be deleted from a document to render it subject to disclosure,' " quoting *Bristol-Myers Co. v. FTC, supra* note 65, 138 U.S.App.D.C. at 25–26, 424 F.2d at 938–939).

72. S.Rep. No. 854, 93d Cong., 2d Sess. 32 (1974).

73. *Department of Air Force v. Rose, supra* note 51.

74. See *Pacific Architects & Eng'rs, Inc. v. Renegotiation Bd., supra* note 65, 164 U.S.App. D.C. at 278, 505 F.2d at 385 ("the agency resisting disclosure" may claim "that the information itself discloses to knowledgeable people the identity of the person who supplied it, [but] some factual basis for that conclusion must be advanced to support the [agency's] non-disclosure."); *Rural Housing Alliance v. United States Dep't of Agriculture, supra* note 22, 162 U.S.App.D.C. at 128, 498 F.2d at 79 (deletions may be "ineffective to protect the privacy and confidentiality of the individuals involved.").

"financial or commercial" information; [75] and the Commission's disclosure of the redacted survey results may indicate that it deemed the latter data, in and of themselves, nonconfidential in nature. This bifurcated analysis, however, has no bearing whatever on whether the Commission in its disclosure can be forced to tie the trade sources to the information they supplied. The whole purpose of blotting out identities is to render the remaining contents of documents nonexempt, and the Commission's success in doing just that cannot be turned against it as a reason for requiring reinsertion of the identifying details.

In addition to its procedural error in bifurcating the evaluation of the requested records, the District Court either failed to apply, or misapplied, the tests this court has established as appropriate for use in assessing claims under Exemption 4. We have held that, aside from trade secrets, the exemption applies only to "'information which is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential.'" [76] Lacking any legislative history defining the scope of the terms "commercial" and "financial," [77] courts have given them their ordinary meanings,[78] and have read the requirement that information

75. See note 69 *supra.*

76. *Getman v. NLRB, supra* note 22, 146 U.S. App.D.C. at 212, 450 F.2d at 673, quoting *Consumers Union v. Veterans Administration,* 301 F.Supp. 796, 802 (S.D.N.Y.1969), *appeal dismissed as moot,* 436 F.2d 1363 (2d Cir. 1971); accord, *National Parks & Conservation Ass'n v. Morton,* 162 U.S.App.D.C. 223, 224, 498 F.2d 765, 766 (1974); *Brockway v. Department of Air Force,* 518 F.2d 1184, 1188 (8th Cir. 1975); *Sears Roebuck & Co. v. GSA,* 384 F.Supp. 996, 1005 (D.D.C.1974); *Tax Analysts & Advocates v. IRS,* 362 F.Supp. 1298, 1307 (D.D.C.1973), *modified in part on other grounds,* 164 U.S. App.D.C. 243, 505 F.2d 350 (1974). Although this much of the exemption on its face seemingly applies only to commercial and financial non-trade-secret information, language in the House and Senate Reports suggesting exempt status for all privileged and confidential information led to some initial uncertainty concerning the scope of Exemption 4. Professor Davis, however, in an early article on the Act, noted that:

the discrepancy between the statutory language and the reports turns out to be a mere inadvertence. The Senate committee simply failed to alter its earlier report, based on, [an] earlier bill without the words "commercial or financial," to reflect the addition of the words "commercial or financial." And the House committee seven months later copied most of the Senate committee report.

Davis, *The Information Act: A Preliminary Analysis,* 34 U. of Chicago L.Rev. at 761, 790 (1967) (footnote omitted). Courts have consistently credited the narrow statutory language over the more inclusive congressional reports. See, *e. g., Brockway v. Department of Air Force, supra,* 518 F.2d at 1189 ("[t]he tendency has been to grant little weight to these passages from the reports on the theory that the passages were taken from previous congressional reports on an earlier draft of the Freedom of Information bill which did in fact

exempt confidential, non-commercial and non-financial matters.").

77. Perhaps the most important fact in the legislative history is that no explanation appears for the addition to the fourth exemption of the words "commercial or financial." The 1964 version of the bill, S. 1666, provided for exemption of "trade secrets and other information obtained from the public and customarily privileged or confidential." That version was adopted by the Senate but the House did not act, and when the bill, S. 1160, was reintroduced in the next Congress as S. 1160, two changes had been made: the word "customarily" was out, and the words "commercial or financial" were in.

Not only was no explanation ever offered for the addition of "commercial or financial," but the Senate and House Committees in their reports both seemed to read the words "commercial or financial" as if they were not there. Davis, *supra* note 76, at 790.

78. See, *e. g., Brockway v. Department of Air Force, supra* note 76, 518 F.2d at 1188–1189 (witness statements concerning cause of airplane crash not commercial or financial in nature); *Getman v. NLRB, supra* note 22, 146 U.S.App.D.C. at 212, 450 F.2d at 673 ("a bare list of names and addresses of employees . . . cannot be fairly characterized as . . . 'financial' or 'commercial' information"). In another case, we passed on the applicability of the terms to research designs created by biomedical scientists, and suggested that "the reach of [Exemption 4] is not necessarily coextensive with the existence of competition in any form." *Washington Research Project, Inc. v. HEW,* 164 U.S.App.D.C. 169, 175, 504 F.2d 238, 244 (1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). We went on to say, however, that "[i]t is clear enough that a non-commercial scientist's research design is not . . . [an] item of commercial informa-

be "obtained from a person" to restrict the exemption's application to data which have not been generated within the Government.[79] The word "confidential," on the other hand, has been the subject of considerable interpretation. The legislative history of Exemption 4 tells us that information is confidential if it "would customarily not be released to the public by the person from whom it was obtained." [80] We ourselves have further held that this

> is not the only relevant inquiry in determining whether . . . information is "confidential" for purposes of [Exemption 4]. A court must also be satisfied that non-disclosure is justified by the legislative purpose which underlies the exemption.[81]

An examination of that legislative purpose has led us to conclude that

> commercial or financial matter is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.[82]

Unfortunately, the District Court's analysis was cut short by its bifurcated consider-

ation of the exemption status of the trade-source identities and the survey results. The identities were not themselves subjected to the confidentiality test because the court decided that they were not "commercial or financial" information. With respect to the trade-source comments, only the first step of the confidentiality test was reached; the court concluded that because the industry suggestions had already been released, they could not be the type of information that is customarily withheld from the public, and therefore could not be confidential within the meaning of the exemption. We have already noted the error in this reasoning.[83]

■ The District Court's misapprehension of controlling law foreclosed the determinations essential to proper assessment of the validity of the Commission's invocation of Exemption 4. Moreover, those determinations would in any event have been inappropriately undertaken on the Board's summary-judgment motion because the record before us reveals disputes as to material issues of fact [84]—particularly with respect to whether disclosure of the trade-source identities would "impair the [Commission's] ability to obtain necessary information in the future." [85] We are unable, therefore to

tion, for it defies common sense to pretend that the scientist is engaged in trade or commerce." *Id.* at 181, 504 F.2d at 244. We also noted that "the Act's recognized mandate to construe exemptions narrowly" precludes us from "extend[ing] them by analogies that lead . . . far away from the plain meaning of Exemption 4." *Id.* at 182, 504 F.2d at 245.

**79.** See *Soucie v. David, supra* note 65, 145 U.S.App.D.C. at 156 n.47, 448 F.2d at 1079 n.47; *Consumers Union v. Veterans Administration, supra* note 76, 301 F.Supp. at 802–803; *Benson v. GSA*, 289 F.Supp. 590, 594 (W.D. Wash.1968), aff'd 415 F.2d 878 (9th Cir. 1969).

**80.** S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965); accord, H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966).

**81.** *National Parks & Conservation Ass'n v. Morton, supra* note 76, 162 U.S.App.D.C. at 225, 498 F.2d at 767.

**82.** *Id.* at 228, 498 F.2d at 770 (footnote omitted).

**83.** See text *supra* at notes 61–76.

**84.** See Fed.R.Civ.P. 56(c) (summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

**85.** Compare Affidavit of Mark J. Powers, Chief Economist, CFTC, at 4, App. 54 ("[i]n my judgment, if confidentiality is not provided to the Commission's sources of expert opinion . . . it would have a chilling effect on the willingness of trade sources to respond fully and completely to the Commission's inquiries"); Affidavit of Stanley S. Ostrowski, Chief of Market Analysis Section, Market Surveillance and Analysis Branch, Central Region, CFTC, at 5, App. 65 ("the confidentiality of the identity of the person interviewed must be protected not only in order to insure that the interviews sought by the Commission are full and complete, but also in order to insure that persons

resolve the controversy with respect to Exemption 4, but rather must remand to the District Court for full findings of fact and conclusions of law. On remand, the court will examine the information derived from the survey and ascertain whether any part of it is "commercial or financial" in nature,[86] and whether that information— which was clearly "obtained from a person" within the meaning of the Act[87]—is confidential as defined in our prior cases.[88]

We are mindful at this juncture of the Board's contention that the trade-source comments here involved are not exempt at all. The argument is that they refer solely to business affairs of the Board, and that Exemption 4 safeguards commercial information only insofar as it concerns the source of the information, and not commercial and financial data supplied to a third party.[89] The Commission counters that this position is without legal basis, asserting that, in any case, the disputed documents do reveal trade-source business information.[90]

We are in agreement with the Commission that the Board's view of the law is erroneous. In plain language Exemption 4 refers only to "commercial" and "financial" information; it does not in any way suggest that this information must relate to the affairs of the provider.[91] As we have already noted, the legislative history does not elucidate the terms "commercial" and "financial,"[92] and courts have given them their ordinary meaning,[93] which in no way connotes the limitation urged by the Board. On the contrary, the purposes revealed by our much earlier examination of the Act's history[94] are sufficiently broad to encompass financial and commercial information concerning a third party so long as it is privileged or confidential. In this respect our view is consonant with that implicit in earlier decisions in which we assumed the applicability of the exemption in situations where information obtained from one person has concerned the confidential business affairs of a third party.[95]

are not deterred from reaching out and contacting the Commission with information pertinent to the Commission's inquiries"); Affidavit of Dennis T. Avery, Special Assistant to the Commissioner, CFTC, at 3, App. 74 ("if confidentiality is not accorded to the identities of sources of expert opinion . . . there would be increasing problems with the willingness of trade sources to provide full and complete information to the Commission") with Affidavit of Warren W. Lebeck, President, Board of Trade of the City of Chicago, at 4, App. 104 (confidentiality unnecessary because "[t]he Board of Trade has never discouraged criticism of any of its commodity futures contracts").

86. See note 78 *supra* and accompanying text.

87. See note 79 *supra* and accompanying text.

88. See notes 80–82 *supra* and accompanying text. The District Court's review of the Commission's action in withholding the disputed information will, of course be a *de novo* review. See H.R.Rep. No. 1497, 89th Cong., 2d Sess. 9 (1965).

89. See Brief of Appellee at 19–21. This theory of the inapplicability of Exemption 4 was not raised at any stage of the District Court proceedings. Though we thus are not required to entertain the question on appeal, we do so in the interest of judicial economy to assist the court on remand in its task of determining whether the information is "commercial" or "financial."

90. See Reply Brief for Appellant at 7–11.

91. See text *supra* at note 61.

92. See note 77 *supra* and accompanying text.

93. See note 78 *supra* and accompanying text.

94. *National Parks & Conservation Ass'n v. Morton, supra* note 76, 162 U.S.App.D.C. at 224–228, 498 F.2d at 766–770.

95. See *Rural Housing Alliance v. U. S. Dep't of Agriculture, supra* note 22, 162 U.S.App.D.C. at 124 n.4, 128, 498 F.2d at 75 n.4, 79 (Exemption 4 held applicable to a report which "includes

In support of its position, the Board points to the legislative history and observes that the specific examples of exempt information enumerated there all relate to the data source.[96] While this illustrates the obvious—that first-party information is covered by Exemption 4—it does not convincingly demonstrate that Congress intended to exclude third-party commercial information from the exemption. In short, the history does not present a sufficiently clear design to overrule the unambiguous language of the exemption and the unmistakable congressional purpose of avoiding impairment of the Government's ability to obtain necessary information.[97] Thus, on remand, the Commission need not establish that the information relates to the business affairs of the trade sources, but only that it is commercial or financial in nature.

If the Commission satisfies its burden of showing the commercial and confidential nature of the disputed records, the deletions of the identities of the sources of that information must stand.[98] Ordinarily, it would be necessary for the District Court to determine whether the Commission could withhold the documents in their entirety because their release might reveal the identities of the suppliers of the information contained therein.[99] This inquiry need not be pursued in the instant case since the redacted records have already been disclosed.[100]

We affirm the District Court insofar as it determined that the documents and identities in question do not fall within Exemption 6 of the Act. We reverse and remand the record for further findings of fact and conclusions of law on the question of Exemption 4 coverage.

*So ordered.*

---

. . . information given by *and with respect to* borrowers and applicants for loans") (emphasis added); *Soucie v. David, supra* note 65, 145 U.S.App.D.C. at 147, 156 & n.47, 448 F.2d at 1070, 1079 & n.47 (confidential views of members of a panel of experts convened to provide an independent assessment of a governmental program eligible for protection by Exemption 4); see also *Benson v. GSA, supra* note 79, 289 F.Supp. at 594 (Dunn and Bradstreet credit report on a private company constituted "financial information obtained from a person and confidential").

**96.** See H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (May 9, 1966), U.S.Code Cong. & Admin. News 1966, pp. 2418, 2427 ("[t]he exemption would include business sale statistics, inventories, customer lists, scientific or manufacturing processes or developments, and negotiation positions or requirements in the case of labor-management mediations. It would include information customarily subject to the . . . lender-borrower privilege[ ] such as technical or financial data submitted by an applicant to a Government lending or loan guarantee agen-

cy."); S.Rep. No. 813, 89th Cong., 1st Sess. 9 (Oct. 4, 1965) (the exemption "would include business sales statistics, inventories, customer lists and manufacturing processes. It would also include information customarily subject to the . . . lender-borrower . . . privilege[ ]. Specifically, it would include any commercial, technical, and financial data, submitted by an applicant or a borrower to a lending agency in connection with any loan application or loan.").

**97.** See note 81 *supra* and accompanying text.

**98.** Of course, only the sources actually providing Exemption 4 materials may be deleted; that is, the presence in a document of some such material does not warrant expunction of identities of all trade sources appearing in the document, but only those that actually provided the exempt data.

**99.** See note 74 *supra* and accompanying text.

**100.** See *Fisher v. Renegotiation Bd., supra* note 62, 153 U.S.App.D.C. at 402, 473 F.2d at 113.